John CROWLEY, Plaintiff,

v.

UNITED STATES, Defendant.

No. 94–711C.

United States Court of Federal Claims.

ORIGINALLY FILED UNDER
SEAL: Aug. 30, 2002.

REISSUED FOR PUBLICATION:
Oct. 9, 2002.

Irving Kator, Kator, Parks & Weiser, P.L.L.C., Washington, D.C., Cathy A. Harris, for the plaintiff.

Scott D. Austin, Heide L. Herrmann, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., James M. Kinsella, Deputy Director, David M. Cohen, Director, for the defendant. James E. Hicks, Office of Chief Counsel, Drug Enforcement Administration, of counsel.

## OPINION

HORN, Judge.

## BACKGROUND

Congress has established a special retirement system for federal law enforcement officers (LEOs), granting Law Enforcement Officers entitlement to an annuity at a younger age and with fewer years of service than other federal employees. 5 U.S.C. § 8336(c)(1) (2000). In addition to the special retirement system, Law Enforcement Officers are eligible for enhanced pay under certain circumstances, pursuant to the Federal Law Enforcement Pay Reform Act of 1990 (FLEPRA), Pub.L. No. 101–509, §§ 401–412, 104 Stat. 1389, 1465–69.[1] A "law enforcement officer" is defined in the statute as "an employee, the duties of whose position are primarily the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States, including an employee engaged in this activity who is transferred to a supervisory or administrative position." 5 U.S.C. § 8331(20). The definition of "law enforcement officer," set forth in 5 U.S.C. § 8331(20), governs the determination of whether an employee is entitled to FLEPRA benefits. See 5 U.S.C. § 5541(3)(A). Pursuant to the regulations promulgated under 5 U.S.C. § 8347, there are three categories of positions that qualify for Law Enforcement Officer credit: (1) primary; (2) secondary supervisory; and (3) secondary administrative. Each category establishes separate requirements for entitlement. See 5 C.F.R. § 831.902 (2002).

The regulations setting forth the standards for qualification as an Law Enforcement Officer are found at 5 C.F.R. §§ 831.903–831.911. There are two methods for claiming entitlement to law enforcement officer status in any of the three categories. 5 C.F.R. §§ 831.905–831.910. First, an agency may determine that the duties of a position meet the criteria for an Law Enforcement Officer position. See 5 C.F.R. §§ 831.903(a), 831.904(a) (2001).[2] Alternatively, "[a]n employee who is currently serving in a position that has not been approved by OPM as a primary or secondary position, but who believes that his or her service is creditable as service in a primary or secondary position and that he or she satisfies the conditions for credit must" submit an application for credit to OPM through the current employing agency. 5 C.F.R. § 831.906(b).[3] For requests from individuals from 1990 to 1993, the employing agency also was required to submit "an advisory opinion to OPM as to whether it believes the individual's service in the position should or should not be credited and, if it qualifies, whether it should be a primary or secondary position." 5 C.F.R. § 831.908(b) (1993). Coverage "in a position or credit for service will not be granted for a period greater than 1 year prior to the date that the request from an individual is received by the employing agency ...." 5 C.F.R. § 831.906(e) (2002).[4] Regarding individual requests for coverage, "[t]he employee bears the burden of proof with respect to credit under 5 U.S.C. 8336(c)." 5 C.F.R. § 831.906(a).[5]

Plaintiff, John Crowley, is one of a number of plaintiffs who have filed claims in this court for Law Enforcement Officer credit. The plaintiffs in these consolidated cases are

---

1. Sections 401–407 and 412 of FLEPRA are found at 5 U.S.C. § 5305 note (2000). Section 408 is codified at 5 U.S.C. §§ 4521–4523, 5541 note; section 409 at 5 U.S.C. § 8335 and 5 U.S.C. § 8425; section 410 at 5 U.S.C. §§ 5542, 5547 (repealed in part by the Technical and Miscellaneous Civil Service Amendments Act of 1992, Pub.L. No. 102–378, § 2(43)), 106 Stat. 1346, 1352; and section 411 at 5 U.S.C. § 5541.

2. Prior to 1994, the regulation allowing an agency to determine Law Enforcement Officer status was contained in 5 C.F.R. §§ 831.905–831.906. See, e.g., 5 C.F.R. §§ 831.905–831.906 (1993).

3. Prior to 1994, the quoted language was contained in 5 C.F.R. § 831.908(b). See, e.g., 5 C.F.R. § 831.908(b) (1993).

4. Prior to 1994, the quoted language was contained in 5 C.F.R. § 831.908(e). See, e.g., 5 C.F.R. § 831.908(e) (1993).

5. Prior to 1994, the quoted language was contained in 5 C.F.R. § 831.908(a). See, e.g., 5 C.F.R. § 831.908(a) (1993).

two hundred forty-nine [6] Diversion Investigators (DIs), employed by the Drug Enforcement Administration (DEA), which is an agency within the Department of Justice (DOJ). The plaintiffs are classified as GS/GM–1810 and range from grade five through grade sixteen on the federal pay scale. The plaintiffs allege that the decision to deny them overtime compensation and benefits in accordance with FLEPRA while providing such compensation to Special Agents, GS–1811 Criminal Investigators, also employed by the DEA, is arbitrary, capricious and not in accordance with the law. The plaintiffs seek relief in this court pursuant to 28 U.S.C. § 1491 (2000), and the Back Pay Act, 5 U.S.C. § 5596 (2000), because of the defendant's refusal to pay them premium and overtime pay, as allegedly required pursuant to FLEPRA, administratively uncontrollable overtime (AUO), as provided by 5 U.S.C. § 5545(c)(2), and availability pay, as provided by 5 U.S.C. § 5545a. The plaintiffs argue that under the applicable law they are Law Enforcement Officers, entitled to receive the same compensation as other DEA Law Enforcement Officers, including Special Agents, based on the actual work performed by them during the course of their employment.

Three individual cases were selected by the parties to serve as the test plaintiffs for this matter: *John W. Partridge v. United States,* Case No. 94–819C, *John D. Crowley v. United States,* Case No. 94–711C, and *John Buckley v. United States,* Case No. 92–469C. Originally, the test cases were selected to cover three categories of plaintiffs: (1) Diversion Investigators; (2) Diversion Group Supervisors; and (3) those from the above two categories who transferred to administrative positions. In addition, the test cases represent plaintiffs from DEA offices in three different geographical regions: Los Angeles, California; Boston, Massachusetts; and Arlington, Virginia. According to the plaintiffs, Mr. Buckley's case was initially "selected for trial as representative of those plaintiffs in the instant case who had transferred initially from Diversion Investigator positions to administrative positions, either

directly or from supervisory positions." In contrast, "Mr. Crowley's case was selected for trial as representative of those plaintiffs who had filed suit in the above-captioned cases and who transferred from Diversion Investigator primary positions to supervisory positions in DEA."

On December 6, 2001, the court issued a decision in *Buckley v. United States,* 51 Fed. Cl. 174 (2001). In its decision, the court found that two of Mr. Buckley's administrative positions, first as a Staff Coordinator in the Office of Diversion in DEA headquarters in Arlington, Virginia, and then as the Deputy Chief of Diversion, qualified him for Law Enforcement Officer credit. *Id.* at 212–214. The court also found, however, that Mr. Buckley's administrative position as an Inspector at the Office of Inspections did not qualify him for Law Enforcement Officer credit. *Id.* at 216. In determining whether Mr. Buckley's administrative positions qualified him for Law Enforcement Officer credit, the court was required to determine, and did find that, his primary and supervisory positions also qualified for Law Enforcement Officer credit. *Id.* at 178. Therefore, as the court has interpreted the statute and regulations, Mr. Buckley's claims raised issues previously reserved for Mr. Crowley's case.

Mr. Crowley has raised the following claims: (1) qualification for a special rate of pay for employees at grades GS–3 through GS–10 pursuant to FLEPRA section 403, 5 U.S.C. § 5305 note (2000); (2) qualification for a special rate of pay for employees who were posted for duty in one of eight specified metropolitan areas pursuant to FLEPRA section 404, 5 U.S.C. § 5305 note; (3) eligibility for premium pay for working scheduled overtime work compensated at the greater of one hundred fifty percent of the GS–10 hourly pay rate, or his own hourly pay rates, pursuant to FLEPRA section 410, 5 U.S.C. §§ 5542, 5547; (4) qualification for premium pay on an annual basis for AUO, at an appropriate percentage, not in excess of twenty-five percent, of such part of the basic pay for the position that does not exceed the mini-

---

**6.** Since the court issued its opinion in *Buckley v. United States,* 51 Fed.Cl. 174, eleven plaintiffs have voluntarily dismissed their claims.

mum rate of basic pay for GS–10, pursuant to 5 U.S.C. § 5545(c)(2)[7]; and (5) eligibility for premium pay given to ensure the availability of criminal investigators for unscheduled duty in excess of a forty hour work week at a rate of twenty-five percent of the rate of basic pay for the position, pursuant to 5 U.S.C. § 5545a.[8]

DEA's predecessor, the Bureau of Narcotics and Dangerous Drugs (BNDD), established the Diversion Control program in 1971, following passage of the Controlled Substances Act of 1970(CSA), Pub.L. No. 91–513, 84 Stat. 1242 (codified at 21 U.S.C. §§ 801 et seq. (1994 & Supp. V 1999)). One of the purposes of the CSA was to combat the illegal diversion of controlled substances to addicts and drug dealers by doctors, pharmacists, manufacturers and distributors. The Act established requirements for the use, storage and distribution of controlled substances, and made the diversion of controlled substances a violation of law punishable under the criminal statutes of the United States. Duties of Diversion Investigators include investigating violations of criminal laws with respect to the diversion of controlled substances into illegal channels and assuring compliance with the requirements created by the CSA.

Diversion Investigators have not been considered by the DEA as meeting the definition of an Law Enforcement Officer for premium pay purposes. Diversion Investigators have not been paid under special pay provisions of FLEPRA and have not received pay for AUO pursuant to 5 U.S.C. § 5545(c)(2) (2000). DEA has adopted the position that once an employee is determined to be entitled to Law Enforcement Officer retirement credit for a period of time subject to FLEPRA, that employee will be paid premium pay pursuant to FLEPRA as follows. DEA will pay the employee premium pay pursuant to FLEPRA section 403, 5 U.S.C. § 5305 note, for any period of time, subsequent to the effective date of FLEPRA section 403, for which it is determined: (1) that the employee is entitled to Law Enforcement Officer retirement credit and (2) that the employee satisfies the requirements of FLEPRA section 403. DEA will pay the employee premium pay pursuant to FLEPRA section 404, 5 U.S.C. § 5305 note, for any period of time, subsequent to the effective date of FLEPRA section 404, for which it is determined: (1) that the employee is entitled to Law Enforcement Officer retirement credit and (2) that the employee satisfies the requirements of FLEPRA section 404 and 5 C.F.R. §§ 531.301–531.306 (2002).[9] DEA will pay the employee premium pay pursuant to FLEPRA section 410, 5 U.S.C. §§ 5542, 5547, for any period of time, subsequent to the effective date of FLEPRA section 410, for which it is determined: (1) that the employee is entitled to Law Enforcement Officer retirement credit and (2) that the employee satisfies the requirements of FLEPRA section 410. Each Diversion Investigator who meets the requirements for premium pay pursuant to FLEPRA discussed above, will be paid retroactively, the amount to which he or she is entitled.

Two hundred forty-nine Diversion Investigators have cases pending in this court. One hundred forty-five of the original plaintiffs have applied to the DEA and/or the Justice Management Division (JMD), a division of the DOJ, for Law Enforcement Officer retirement credit under the Civil Service Retirement System (CSRS), as provided by 5 U.S.C. §§ 8331(20), 8336(c) (2000), and under the Federal Employee Retirement System

---

7. According to plaintiff's brief, Mr. Crowley does not seek unpaid AUO for any period prior to August 2, 1985, because of the six year statute of limitations established by 28 U.S.C. § 2501 (1994). Mr. Crowley filed his claim, however, on October 12, 1994. Therefore, the statute of limitations would bar Mr. Crowley's claims for AUO prior to October 12, 1985.

8. Although a FLEPRA section 407 claim is discussed in some of the papers filed with the court, this claim is not mentioned in either the plaintiff's initial complaint or its second amended complaint, which was filed on March 5, 2001. Because the second amended complaint establishes the claims before the court, the merits of a FLEPRA section 407 claim will not be addressed.

9. Subpart C—Special Pay Adjustment for Law Enforcement Officers, was first published at 57 Fed.Reg. 2432 (Jan. 22, 1992) (codified as amended at 5 C.F.R. §§ 531.301–531.305 (1993)).

(FERS), as provided by 5 U.S.C. §§ 8401(17), 8412(d). By 1995, the JMD only had issued final orders on nine of the one hundred forty-five pending applications. Subsequently, the JMD issued additional decisions, but as discussed at numerous status conferences with the court, the rate of decision making at DOJ was, at best, extremely slow. All nine of the applications decided by 1995 were denied, and each affected Diversion Investigator filed an appeal to the Merit Systems Protection Board (MSPB).

The nine cases were consolidated on appeal, and two of the cases, James T. Hannon and Ronald J. Townsend, proceeded to a hearing on December 11, 1995. The remaining seven appeals were stayed at the MSPB pending final resolution of the two designated cases. On April 30, 1997, MSPB Administrative Judge Jenkins issued a decision reversing the JMD's denial of Law Enforcement Officer retirement credit, concluding that both plaintiffs were entitled to Law Enforcement Officer retirement credit under their respective retirement systems. The government filed a Petition for Review before the MSPB on June 3, 1997. The MSPB issued a final decision in the case of James T. Hannon on June 11, 1999, reversing the Administrative Judge's decision. The MSPB decision found that Mr. Hannon was not entitled to Law Enforcement Officer retirement credit under the CSRS, pursuant to 5 U.S.C. §§ 8331(20), 8336(c), consistent with the JMD's denial of Law Enforcement Officer retirement credit. *Hannon v. Dep't of Justice,* 82 M.S.P.R.[10] 315 (1999). The MSPB issued a final decision in the case of Ronald J. Townsend on August 31, 1999, also reversing the Administrative Judge's decision, and similarly holding that he was not entitled to Law Enforcement Officer retirement credit under the FERS, pursuant to 5 U.S.C. §§ 8401(17), 8412(d). *Townsend v. Dep't of Justice,* 83 M.S.P.R. 427 (1999). On December 7, 2000, the United States Court of Appeals for the Federal Circuit affirmed the MSPB's decision which had found that James T. Han-

non was not entitled to Law Enforcement Officer credit. *Hannon v. Dep't of Justice,* 234 F.3d 674 (Fed.Cir.2000) (stating that it was unpersuaded that the Board's factual determinations were not based on substantial evidence and declaring that the Board's application of the law to those facts was not arbitrary and capricious, an abuse of discretion or otherwise not in accordance with the law), *cert. denied* —— U.S. ——, 122 S.Ct. 665, 151 L.Ed.2d 579 (2001). On June 6, 2001, the United States Court of Appeals for the Federal Circuit affirmed the MSPB's decision regarding Ronald J. Townsend. *Townsend v. OPM,* 13 Fed. Appx. 962 (Fed.Cir.2001) (using the substantial evidence, arbitrary or capricious, abuse of discretion or otherwise not in accordance with the law standards), *cert. denied, Hannon v. Dep't of Justice,* —— U.S. ——, 122 S.Ct. 665, 151 L.Ed.2d 579.

In the Crowley case currently before this court, the defendant filed a motion to dismiss, which the court denied in its opinion of October 6, 2000. *See Hannon v. United States,* 48 Fed.Cl. 15 (2000). Before the case was tried, the parties also filed briefs regarding an issue raised by the plaintiff and jointly stipulated to by the parties as follows:

> Whether the previous decision of the Office of Personnel Management to grant plaintiffs primary law enforcement officer credit is sufficient to satisfy plaintiffs' burden of demonstrating, for purposes of obtaining secondary law enforcement officer credit, that they previously occupied a primary law enforcement officer position or whether plaintiffs must demonstrate, through evidence of their primary job activities, that the primary position they occupied was a law enforcement officer position.

At the pre-trial conference, the court informed the parties that the question raised by the plaintiff's argument would be addressed in the court's final opinion on the merits. The test case of *Crowley v. United States* was tried in Boston, Massachusetts and Washington, D.C. This opinion addresses each of Mr. Crowley's claims.

---

**10.** Although the decisions of the MSPB are officially published in the Decisions of the United States Merit Systems Protection Board

(M.S.P.B.), following the Federal Circuit's lead, citations are made to the United States Merit Systems Board Reporter (M.S.P.R.).

## FINDINGS OF FACT

Mr. Crowley's career with the DEA, and its predecessor, the BNDD, covers four periods. First, from March 12, 1973 until June 15, 1986, Mr. Crowley served as a Diversion Investigator in the Boston, Massachusetts regional office of the BNDD and, subsequently, the DEA. From June 16, 1986 until February 24, 1991, Mr. Crowley served as a Group Supervisor in the Boston, Massachusetts regional office of the DEA. From February 25, 1991 until October 30, 1994, Mr. Crowley worked as a staff coordinator for the Office of Diversion Control at DEA headquarters in Arlington, Virginia. Finally, on October 31, 1994, Mr. Crowley transferred back to the Boston, Massachusetts regional office as a Group Supervisor. In April of 2001, Mr. Crowley became the Special Assistant to the Diversion Program Manager. Mr. Crowley retired from DEA on October 1, 2001. Testimony and comments by counsel suggest that the Boston, Massachusetts regional office, where Mr. Crowley worked as a Diversion Investigator and Group Supervisor, generally covered six New England states: Maine, New Hampshire, Vermont, Rhode Island, Connecticut and Massachusetts.

Mr. Crowley was recruited in 1973 by Matthew Seifer, a Special Agent who was in charge of the Compliance Group, as the Diversion Group was called at that time. During an interview, Mr. Seifer explained to Mr. Crowley that the government was establishing the Compliance Program to provide oversight of the pharmaceutical industry and to investigate what Mr. Seifer called "bad doctors" and "bad pharmacists." Mr. Seifer warned Mr. Crowley, though, that the job would entail long hours. According to Mr. Crowley, Mr. Seifer told him to "go home and talk to your spouse, talk to your wife, talk to your family because this is not a 9:00 to 5:00 job."

## I. Diversion Investigation Duty: 1973–1986

Mr. Crowley spent the majority of his first year as a Diversion Investigator performing regulatory, or "cyclic," investigations. Indeed, according to a DEA study of the Diversion Control Program conducted from May 1982 until April 1983, the Diversion Investigator position was originally created to "ensure[ ] compliance with the regulatory aspects of the Controlled Substance Act." The regulatory aspects of the Diversion Investigator position center on conducting cyclic (regulatory) investigations, which are "unannounced in-depth audits of controlled substances activity, focusing on production and inventory levels and purchase, transfer, and sales records. Other key activities include the review of internal accounting practices, inventory procedures, security systems, registration information, and existing systems that monitor their customer's purchases/actions." In 1974, however, Mr. Crowley began to work on more criminal investigations. In this regard, the DEA study explained the evolution of the Diversion Investigator program as follows:

> Prior to 1979, the Office of Compliance and Regulatory Affairs devoted most of its investigative resources towards ensuring compliance with the regulatory aspects of the Controlled Substance Act. As DEA redirected its resources from wholesaler/manufacturer compliance to retail diversion, a larger portion of its resources were spent on criminal investigations. Currently, while regulatory investigations at the non-practitioner level still remain an intricate part of the diversion effort, criminal retail diversion has emerged as the area of major concern.

The shift toward criminal investigations occurred partly because "[b]ly 1977, the Office of Diversion Control concluded that the cyclic investigation program had effectively reduced diversion at the non-practitioner level and that a shift to practitioner level was necessary to attack the growing retail diversion problem." The DEA study, although critical of the criminal investigation role of Diversion Investigators (GS 1810's) as opposed to DEA Special Agents (GS 1811's), found that Diversion Investigators were doing criminal investigatory work even to the point of finding that the two groups were in "competition in the dangerous drugs area." The report also noted that: "In effect DEA has created and is perpetrating a two tier

enforcement program. One enforcement effort against practitioner diversion and one enforcement effort against all other drugs. The 1810 core group has in effect become defacto 1811s." The DEA report also noted that "the increased danger to 1810 personnel" as well as "the evolution of a sec[o]nd and separate enforcement effort ..." was "particularly disturbing," and that "Field OD [Office of Diversion] personnel are directed to work criminal cases." Thus, although the Diversion Investigator position originally may have been created primarily to perform cyclic documentary reviews, the basic reasons for the existence of the position began to shift in the mid-1970's and by 1983, DEA policy "reflect[ed] an agency belief that the most effective way to impact diversion [was] through criminal investigations ...." and in fact, many Diversion Investigators became primarily criminal investigators.

At trial, Mr. Crowley testified that the first year he worked as a Diversion Investigator, forty to fifty percent of his time was devoted to regulatory investigations.[11] Following that first year, however, the amount of time Mr. Crowley spent on regulatory investigations dropped to fifteen to twenty percent and remained steady through to the time of trial. Ed Sullivan, a Diversion Investigator who worked out of Boston, Massachusetts with Mr. Crowley from 1982 to 1987, testified that, to his knowledge, Mr. Crowley spent one hundred percent of his time on criminal investigations. John Cronin, Mr. Crowley's Group Supervisor from 1978 to 1982, testified that Mr. Crowley spent the majority of his time as a Diversion Investigator performing criminal investigations. Finally, Dennis Johnson, Mr. Crowley's Group Supervisor from February of 1983 to March of 1984, testified that no more than twenty to twenty-five percent of Mr. Crowley's work was concerned with cyclic investigations.

John Coleman, the Special Agent in Charge of the Boston DEA regional office from 1985 to 1990, testified that the geographic position of the Boston office affected the number of cyclic investigations performed by that office. According to Mr. Coleman, areas with a larger proportion of pharmaceutical manufacturing plants engaged in more cyclic investigations than other, less concentrated areas. Mr. Coleman stated that in New Jersey, where he was Special Agent in Charge from 1994 to 1997, the large number of pharmaceutical manufacturing plants required more cyclic attention. In contrast, other regions, such as those controlled by the Boston office, "do not have pharmaceutical plants or distribution, or distribution warehouses and so forth, and so they have fewer, by number, cyclic investigations assigned to them." Mr. Coleman also testified that in Boston, "[t]he emphasis was definitely on the criminal [investigations]. I mean, I ran three major field divisions in DEA while I was there, Boston, Chicago and New Jersey, and of all three, Boston was probably the most active in terms of criminal investigations," and that in Boston most of the time was spent on criminal investigations.

A Diversion Investigator's criminal responsibilities involved the investigation of doctors and pharmacists who were suspected of distributing controlled substances outside of the usual course of professional practice. To a lesser extent, Diversion Investigators also investigated burglaries of pharmacies. Mr. Crowley used a number of investigatory methods to gather information to support a case for the criminal diversion of controlled substances, which Mr. Crowley would then present to the United States Attorney's Office. "I saw myself as an, as an investigator, who investigated violations of federal law and brought them to the court," Mr. Crowley testified.

Beginning in 1977, pursuant to DEA policy, Mr. Crowley was limited in the scope of his duties. In January 1977, Donald E. Miller, Acting Deputy Administrator of the DEA, attempted to further define the roles and responsibilities of the Diversion Investigators and issued a memorandum (the Miller Memorandum) aimed to clarify DEA policy regarding the duties of Diversion Investigators. The Miller Memorandum stated:

---

11. Mr. Crowley has never requested Law Enforcement Officer credit for his first year as a Diversion Investigator.

Effective immediately, Compliance Investigators [12] will not participate directly in:

(1) Undercover purchase of evidence (investigators may continue to control such cases they have developed involving illegal sale by a registrant, but call upon 1811 assistance for the actual undercover purchases. The 1811, of course, will control the actual circumstances of the buy situation, and the advisability of such an approach).

(2) Direct, register and pay informants—This does not mean 1810's may not interview sources of information, assist in debriefing of established informants relating to diversion or availability of legitimate drugs, however, the controlling and paying of confidential informants will be conducted by GS–1811's;

(3) Conduct moving surveillance—There are limited occasions in which 1810's will conduct activity which may be considered surveillance, such as monitoring the number of patients entering a methadone clinic prior to examining records, however, 1811's will conduct activity such as following suspected diverters;

(4) Arrests and execution of search warrants—These activities will be conducted by 1811's. On *limited* occasions involving registrants, 1810's may be present after the area is secured, for technical assistance in their area of expertise of the case, i.e., identify the drugs present, identify records or documents important to the case, etc.

It is recognized that these criminal investigative functions may complement certain (compliance) investigations being handled by compliance groups in which possible criminal violations have been indicated. In those cases, Regional management should ensure 1811 support is provided in line with case load priority at the time. Additionally, 1810's should be utilized in all cases involving registrants, whether originated by 1810 or 1811 personnel.

(emphasis in original).

On June 18, 1984, Francis M. Mullen, Jr., the Administrator of the DEA at that time, considered restructuring the 1810 position and issued a memorandum (the Mullen Memorandum), affirming the amended restrictions on the duties of Diversion Investigators:

The following enforcement actions will *not* be conducted by 1810 personnel:

(1) Undercover activities of any kind;

(2) Execution of arrest or search warrant. The 1810 investigator may be present after the area has been secured in order to identify records, documents or drugs;

(3) Conducting of surveillances, either moving or stationary; and

(4) Developing, direction or paying informants. This does not deny the 1810 the ability to develop or receive information from registrants or drug industry officials who wish to lend their support to investigations or to provide information on diversion. An 1810 investigator may accompany 1811 personnel in the debriefing of informants when such debriefing takes place in a secure premises; for example, a DEA office, police station, etc.

(emphasis in original).

The restrictions established in the Mullen Memorandum were reiterated in the 1984 and the 1990 Diversion Investigator Manuals, as well as in the 1996 Diversion Investigator Manual testified to at trial as the current version. On February 28, 1995, Gene Haislip, then Deputy Assistant Administrator for the DEA, issued a memorandum to all domestic Special Agents in Charge, reiterating the DEA policies regarding the duties of Diversion Investigators and stating:

Recently, there have been many questions concerning Diversion Investigator (1810) hiring, 1810 duties, etc. I would like to remind everyone that the 1810 work force continues to be required to work under the guidelines of June 18, 1984, issued by then Administrator Francis M. Mullen, Jr., (copy attached) which reiterated the 1977

---

**12.** Diversion Investigators were previously known as "compliance investigators," but the two terms describe the same position within DEA.

Memorandum from Donald Miller, then Acting Deputy Administrator.

In this same memorandum, Mr. Haislip again listed the actions which the Diversion Investigators were not supposed to perform.

Harold Wankel,[13] who became familiar with the diversion program from January 1990 to October 1996 as Deputy Assistant Administrator in charge of the Office of Investigative Support and as Chief of Operations for DEA, stated that the purpose behind the Miller Memorandum was "to keep the Diversion Investigators out of harm's way and also to preclude them from getting engaged or involved in activities which they had not been trained in how to conduct or handle."

Despite the restrictions imposed on Diversion Investigators by the Miller and Mullen Memoranda, however, the evidence in the record demonstrates that the Diversion Investigators still often encountered dangerous situations while performing their duties. The record also establishes that although DEA policy, as expressed through the Miller and Mullen Memoranda, prohibited Diversion Investigators from performing certain duties, the practice in the field was different from the stated policy. Mr. Crowley testified that:

> From a personal standpoint, I would say to my group supervisor, who, whoever that was, that I will do my best to stay within the spirit of that memorandum. That, that policy memorandum.... If, if I have to get involved in a, in a situation, if I can, I'll tell you ahead of time. If I, if I can't tell you ahead of time, I'll tell you when its over.

Mr. Crowley also testified that he did not stand outside waiting for a Special Agent to secure the premises during searches, but that he entered the premises with the Special Agents. Furthermore, Mr. Crowley testified that neither the Miller nor the Mullen memorandum completely foreclosed his ability to participate in surveillance. After the distribution of the Miller Memorandum, which forbade moving surveillance, Mr. Crowley continued to conduct moving surveillance with special agents, state or local police. At trial,

Mr. Crowley acknowledged that it was his understanding that the Miller Memorandum forbade unilateral moving surveillance. Moreover, following the Mullen Memorandum, which purportedly forbade surveillance altogether, Mr. Crowley testified that "[m]y understanding was that, again, on a unilateral basis, I would not do that on my own, but in conjunction with state or local law enforcement, or our own special agents, I would do it." Finally, Mr. Crowley's supervisors knew that he was performing such activities because he described them in his reports.

Furthermore, even when the Diversion Investigators fully complied with the restrictions set forth in the Miller and Mullen Memoranda, these restrictions did not entirely shield the Diversion Investigators from encountering dangerous situations. The Office of Planning and Evaluation, Planning and Inspection Division at DEA issued a report entitled "Evaluation of the Diversion Control Program," on May 1, 1983. After conducting "research, file review, interviews, quantitative analysis and the on-site review of actual operations," the report included the following findings:

> There is inherent danger in an 1810's job. Whenever an audit is conducted, the possibility exists, although remote, that a registrant or cohort may react unpredictably, at times becoming hostile or irrational. An audit at a Narcotics Treatment Program (NTP) can be particularly dangerous. NTPs are usually located in depressed areas, the clientele are suspicious of Government agents, and frequently illegal activities are suspected at these sites. Although the study team failed to find any recorded incidences of injuries to 1810s conducting audits, 1810 personnel related a number of situations where injuries could have occurred. Whereas the study team is concerned about the 1810's safety regarding their regulatory duties, we are particularly disturbed by the increased danger inherent in criminal investigations.... With OD's [the Office of Diversion's] aggressive

---

13. Mr. Wankel's testimony on direct and cross-examination in the *Buckley v. United States,* Case No. 92–469, 51 Fed.Cl. 174, trial was designated by the parties to be entered into the record in the instant matter.

entry into criminal cases the danger factor for 1810s increases substantially.

. . . .

While 1811 support varied from office to office, every 1810 group supervisor interviewed related at least one incident where the lack of agent support impacted a case.

. . . .

In effect DEA has created and is perpetuating a two tier enforcement program. One enforcement effort against practitioner diversion and one enforcement effort against all other drugs. The 1810 core group has in effect become defacto 1811s.

On June 14, 1988, Mr. Haislip wrote a memorandum to the Chief of the Congressional Affairs Section of DEA, explaining the hazards faced by Diversion Investigators when interviewing "patients" of the doctors and pharmacists being investigated: "Because of drug use, [the patients'] behavior is seldom predictable. For the Investigator, the situation is at the least very stressful and can be extremely hazardous." On February 13, 1990, a diversion group supervisor wrote a memorandum to the Chief of the Planning and Policy Assessment Unit explaining that although prohibiting Diversion Investigators from performing undercover activities was intended to protect the Diversion Investigators:

> [I]t is *far more dangerous* for Diversion Investigators to enter a Narcotic Treatment Program (NTP) or Methadone program, which often times treats hundreds of hard core drug addicts in major urban high crime areas (where many NTPs are located), to conduct a regulatory investigation, than it is to do undercover work in a doctor's office.

(emphasis in original).

Mr. Crowley never has had the authority to carry a weapon, to arrest individuals, to work undercover, or to execute search warrants. Before the Miller Memorandum was issued, Mr. Crowley directed informants and under present DEA policy, Diversion Investigators now can register, direct, and pay informants. Even following the Miller and Mullen Memoranda, however, Mr. Crowley testified that he had substantial involvement with undercover buys. In one situation, Mr. Crowley worked with a Special Agent for assistance in using an informant to make several undercover purchases. Mr. Crowley "directed those undercover purchases of evidence. I handled, I directed the, the informant what to do. I debriefed him beforehand. I debriefed him afterwards. I kept him under surveillance, with the special agents, during the, during the [buy]."

During the trial, Mr. Crowley, his supervisors, and his partners, both from the DEA and from state and local law enforcement, gave a number of examples of the investigations Mr. Crowley performed as a Diversion Investigator. One of the earlier cases testified to involved Bodowin's Drugstore in Kennebunk, Maine. Bodowin's Drug Store was Maine's oldest and largest retail pharmacy. The investigation was initiated after the State of Maine's Board of Registration in Pharmacy notified the Boston DEA regional office that it suspected that Bodowin's was failing to maintain adequate records and that it was diverting controlled substances. Mr. Crowley worked with another Diversion Investigator on the case, Patrick Hunt.

The first step taken by Mr. Hunt and Mr. Crowley in investigating the Bodowin Pharmacy was to apply for an administrative inspection warrant. An administrative inspection warrant allows the government to enter a building used by someone registered to distribute controlled substances and inspect the records and drug stock of the registrant. 21 U.S.C. § 880 (2000). To obtain an administrative inspection warrant, a Diversion Investigator presents a judge or magistrate with a "public interest" in enforcing the drug laws of the United States sufficient to justify an administrative inspection. *Id.* Mr. Crowley testified that he would serve administrative warrants during business hours and attempt to conduct the search without disturbing the activity within the pharmacy. Regardless of the administrative nature of the warrant, however, Mr. Crowley explained that:

> [T]he pharmacist would, would know I was doing something, and it would be kind of a tense situation in many respects, because the, the Drug Enforcement Administration does not inspect retail pharmacies. We

haven't got the, the resources, the, the statute was setup to do that as a nonpractitioner level; that's the drug company. We did not routinely visit retail pharmacies with an admin warrant. That would be something that would indicate to a reasonably prudent person that somet[hing]—he might have been in trouble. Mr. Crowley and Mr. Hunt testified that serving administrative warrants was intensified because some of the pharmacists were armed.

On October 8, 1974, Mr. Hunt swore out an affidavit and an administrative inspection warrant was issued to allow Mr. Hunt and Mr. Crowley to inspect Bodowin's Pharmacy. On the same day, the two began their inspection. Mr. Crowley testified:

> One of the things I remember about that, incidently, is that when we went in there, it was very, very tense. I don't know the reason for that. I thought we conducted ourselves in a reasonable matter [sic], but the entire four days that we were on that location, it was, it was a tense situation.

The focus of Mr. Hunt and Mr. Crowley's search was to establish how the business was being run from an accounting standpoint. As a result of their search, the Diversion Investigators determined that Warren E. Bodowin, the pharmacist and president of Bodowin's Pharmacy, was filing illegitimate prescriptions for drug seeking individuals.

During the inspection, Mr. Crowley and Mr. Hunt advised Mr. Bodowin of his Miranda rights. Subsequently, Mr. Bodowin refused to speak with Mr. Hunt or Mr. Crowley. As a result, the Diversion Investigators developed a different approach to the investigation, deciding to interview about fifty patients to determine if they had legitimately received their prescriptions. Through the interviews Mr. Crowley discovered that a Dr. Cleveland was writing a number of the prescriptions that were being presented in Bodowin's Pharmacy. The interviews further disclosed that the "patients" would pay Dr. Cleveland for an "office visit," spend a minute or two in the office, and receive a prescription. Mr. Crowley testified that: "[W]e found out that there was no legitimate, at least in our opinion, there was no legitimate

doctor/patient relationship .... They would just say that they were here for the drugs." Mr. Crowley testified that he uncovered a "conspiratorial relationship in the sense that his [Dr. Cleveland's] prescriptions were making their way right to his, right to Bodowin's Pharmacy." According to Mr. Crowley, the relationship was necessary because the prescriptions would not have been filed at other pharmacies because they were not properly formatted.

Mr. Crowley also found that many of the patients had long criminal records due to their drug abuse problems. In addition, they had been arrested many times for breaking and entering and for using fraudulent prescriptions to support their drug addiction. Mr. Crowley described one situation in which he and Mr. Hunt participated, which he felt was particularly dangerous:

> So, in order to conduct an interview, you knock on the door and say, and, you know, just wait, and if there is no answer, you knock on the door again. The third time, I just said, "Jack Crowley, Drug Enforcement Administration." You know, kind of stupid probably now that I thought of it, but what was actually happening in that apartment was there, there were about twenty addicts having a "shoot-em-up party." I mean, they were, they were actively shooting heroin. They were, whatever they do at a drug party....
>
> Q. Was there consternation at your arrival?
>
> A. Oh, yes. There was a lot of consternation. Thank goodness I had a certain presence. You know, in retrospect, I, I, I probably burned a good thing. She was never going to say it to me, but I had to clear out the room, tell most of the people in there to leave, go take a walk and come back later. I should have probably called an ambulance for one or two, two of them, but, yeah, we, we had to calm down the activity.

Mr. Crowley and Mr. Hunt presented their findings to the United States Attorney's Office on March 27, 1975. Mr. Bodowin was indicted, but ultimately acquitted, of unlawful distribution of controlled substances. Mr.

Bodowin was convicted, however, on state charges of selling drugs to undercover agents. Throughout the prosecution of the Bodowin case, Mr. Crowley worked "unbelievably long hours" and was on call to his group supervisor and the prosecutor.

Edward Drinan, the Special Agent in Charge for the Portland, Maine DEA office from 1977 through 1981, testified about another instance early in Mr. Crowley's career when Mr. Crowley's investigative techniques uncovered a crime. Mr. Drinan received a call from the president of Mercy Hospital in Portland, Maine. The hospital suspected tampering with the painkilling medicine being given to patients. The painkillers were not effective, and as a result, terminally ill patients were dying in great pain. Because Mr. Crowley was in Maine that day, Mr. Drinan considered him, and every DEA employee in Maine, to be on call twenty-four hours a day. Mr. Drinan assigned Mr. Crowley to track how the prescribed painkillers got from the pharmacy to the patient, who came in contact with the painkillers, and how the painkillers could be diverted. Mr. Drinan testified:

> I sat and held hands with the hospital president while Crowley did his thing. As a result of Jack's efforts, we discovered that a pharmacist employed by the hospital was an opium addict, a drug addict, and that he had, over a period of two months, carefully and meticulously disassembled these powerful painkillers of morphine and dilaudid.

The suspect was taken to the Portland police station where he confessed. Although the pharmacist was only stripped of his license, Mr. Drinan characterized the episode as "an example of a diversion case that has a criminal element in it."

Mr. Crowley also testified regarding his investigation of a burglary at the Wyeth Laboratories distribution center in Andover, Massachusetts. On the morning of September 27, 1976, Mr. Crowley received a call from the warehouse manager of Wyeth Laboratories stating that their distribution center had been broken into and that most of the firm's inventory of Schedule II controlled substances had been stolen. Because the firm was a DEA registrant, Mr. Crowley coordinated the investigation.

Later that morning, Mr. Crowley, Mr. Hunt, and their Group Supervisor, Mr. Seifer, accompanied by state agents, began an on-site investigation of the Wyeth Laboratories distribution center. Mr. Crowley found that the thieves had disabled the security system by cutting the telephone wires, climbed down through a hole in the roof of the building and broken into the vault by burning through a combination lock. Mr. Crowley discovered the severed telephone wires by climbing up the telephone pole to see where the alarm system had been cut. Mr. Crowley discovered the point of entry by climbing on top of the roof and then climbing down through the hole the thieves had cut.

Following the on-site investigation, Mr. Crowley began what he described as "gumshoe investigations." Under the direction of Mr. Seifer, Mr. Crowley began to interview a number of witnesses, including individuals working for the drug company, for the alarm company, and burglary experts in the area. Mr. Crowley found that the company monitoring the security system, 3M Alarm Service, had failed to respond to a signal representing circuit line difficulties. As a result, Mr. Crowley considered the employees of the alarm service to be the first suspects.

A number of suspects were developed as a result of Mr. Crowley's investigations. In December of 1976, the investigation focused on a property upon which two vehicles and a U–Haul truck were parked. Along with others, Mr. Crowley conducted surveillance to ensure that the vehicles did not leave the property. Subsequently, an individual identified as Mr. Touresco, attempted to drive away from the property and was stopped by state police officers who were surveilling the property at the time. Mr. Touresco was taken to the Northampton State Police Barracks where he was detained, but not arrested. Mr. Crowley read Mr. Touresco his Miranda rights, was responsible for keeping him detained, and interrogated Mr. Touresco for about four hours.

Ultimately, an informant developed by a Special Agent led the investigation to a ga-

rage in Coventry, Rhode Island owned by a Mr. Koval, where a majority of the drugs were recovered. Mr. Crowley was present at the seizure. Mr. Crowley testified in front of the Grand Jury in Rhode Island concerning the burglary and the identification of the drugs at issue. Mr. Koval, who had ties to organized crime, was sentenced to five years in prison. Mr. Crowley testified that he worked long hours during the Wyeth Laboratories investigation. In addition, Mr. Crowley had frequent contact with criminal suspects, such as burglary experts, the employees for the alarm company, and Mr. Touresco.

In 1978, Mr. Crowley uncovered what Edward Drinan described as "the largest diversion case of legitimate controlled pharmaceuticals in the history of Maine." Acting on a tip from a drug company, Mr. Crowley discovered that Clukey Pharmacy in Bethel, Maine was ordering unusually large amounts of stimulants. Consequently, Mr. Crowley conducted an administrative inspection of the pharmacy. Before presenting the administrative inspection warrant, however, Mr. Crowley spoke with Bob Stearns, the Chief of Police in Bethel, Maine. Mr. Stearns told Mr. Crowley that the owner of Clukey Pharmacy, Harold Clukey, was extremely dangerous and was the most prominent criminal suspect in the area. Thus, upon serving Mr. Clukey with the administrative inspection warrant, Mr. Crowley asked Mr. Clukey if he was carrying a weapon. Mr. Clukey responded that he was, and produced two or three rifles. Mr. Crowley secured the rifles in a separate area during the on-site investigation. Subsequently, Mr. Crowley, accompanied by Deputy Sheriff Deborah Conroy and Diversion Investigator Walter Houghton, interviewed Mr. Clukey and performed the inspection.

Information developed during Mr. Crowley's investigation indicated that Mr. Clukey was smuggling pharmaceuticals to Florida in his private airplane and returning with loads of marijuana and cocaine. Mr. Crowley served Grand Jury subpoenas to Mr. Clukey and several people working in his establishment. Mr. Clukey was indicted and plead guilty to unlawful distribution of a controlled

substance and was sentenced to one year in prison, a five year special parole term and a $3,000.00 fine. Subsequently, Mr. Crowley brought his information to the State Medicaid Fraud Unit. As a result, Mr. Clukey was prosecuted in Maine by the state authorities for Medicaid Fraud and received a sentence of two years in prison.

Finally, Mr. Crowley testified regarding an investigation that he began while a Diversion Investigator and continued as a Group Supervisor: Manny's Apothecary. The investigation began with Mr. Crowley focusing on a psychiatrist located in Brookline, Massachusetts, Dr. Daniel Zoll, who Mr. Crowley suspected of writing prescriptions without a valid medical reason. The prescriptions included narcotics, at a time when psychiatrists could not write prescriptions for drug addiction. Mr. Crowley also became suspicious of the pharmacist who was filling the prescriptions, Emanuel "Manny" Rosengard. According to Mr. Crowley, his investigation indicated that Mr. Rosengard was charging "unbelievable high, high rates," up to four or five hundred dollars per prescription. In addition, Mr. Rosengard would only fill prescriptions late in the day, from 4:00 to 6:00 p.m. Mr. Rosengard had a lookout posted at the front of the pharmacy. Finally, Mr. Crowley suspected that Mr. Rosengard was forging prescriptions as well as filling Dr. Zoll's improper prescriptions.

Mr. Rosengard's pharmacy, Manny's Apothecary, was located in South Boston in an organized crime area. Mr. Crowley testified that "every establishment there had some kind of lookout up front, whether it was a liquor establishment or, the ones that were suspected of doing illegal activity. That included this particular drugstore." Dennis Johnson, the supervisor of the Boston diversion unit at the time of the investigation, testified that "[t]he ability to get in there [South Boston] and do an investigation without becoming, having the defendant become aware of it was very, very difficult. Very difficult." Because it was so difficult for a law enforcement officer to safely enter the store, Mr. Crowley developed an informant and controlled her along with Special Agent William Powers. Mr. Crowley had the infor-

mant perform undercover buys at the pharmacy. In addition, Mr. Crowley performed surveillance of the store with Special Agents. According to Mr. Crowley, his surveillance was ineffective because, due to the dangerous neighborhood, he and the special agents were forced to station themselves a block away from the pharmacy. Nor were the undercover buys successful. Finally, Mr. Crowley performed an administrative inspection with a warrant. As a result, Mr. Crowley found evidence which led to Mr. Rosengard losing his DEA registration.

## II. Group Supervisor Duty: 1986–1991

Mr. Crowley was promoted to the position of Diversion Group Supervisor in June of 1986. Subsequently, Mr. Crowley was approached by Jim Carr, a detective in the Suffolk County Organized Crime Unit. Mr. Carr had been involved in a long term investigation concerning cocaine trafficking in South Boston. Evidence collected by Mr. Carr through wire taps led him to Emanuel Rosengard. Mr. Carr approached Mr. Crowley because Mr. Crowley knew Mr. Rosengard and the layout of the building he was using from the earlier investigation of Manny's Apothecary. Mr. Carr acquired and served a criminal search warrant. Mr. Crowley participated in the search.

Mr. Crowley, Mr. Carr and other Boston Police Detectives rehearsed the search at 5:30 in the morning. Mr. Carr served the search warrant midmorning. As Mr. Carr approached the building, Mr. Crowley testified that he was directed by a sergeant of the Boston Police Department to: " 'Get in there. What are you waiting for?' You know, as we were approaching. 'Come on. Get right up there.' " Thus, Mr. Crowley walked through the door to the building right along with Mr. Carr. According to Mr. Crowley, Mr. Rosengard had weapons at the location and was disarmed, and the police proceeded with the search. Next, Mr. Crowley and Mr. Carr then sought out an individual, William Cavanaugh, who was one of Mr. Carr's main targets. Mr. Crowley led Mr. Carr downstairs, which was comprised of five or six interwoven rooms with common areas. As Mr. Crowley and Mr. Carr entered one of the side rooms, they literally ran into Mr. Cavanaugh. Mr. Carr announced that they were the police, and Mr. Cavanaugh resisted. Mr. Carr wrestled with Mr. Cavanaugh and forced him to the ground. Mr. Cavanaugh was placed under arrest. Mr. Crowley indicated that Mr. Cavanaugh was on his way to do his daily cocaine dealing and he had a large amount of Valium on him. According to Mr. Crowley, "[t]hey used to deal the two substances together, the cocaine and the Valium tablets. The Valium would, would be to help the addict come down or something afterwards."

The search of Manny's Apothecary found four kilos of cocaine and 65,000 blue Valium tablets. The authorities also found laboratory equipment, one hundred marijuana plants and five or six handguns. Mr. Crowley testified that throughout the investigation, he had contact with criminal suspects, including Mr. Rosengard, Mr. Cavanaugh and the patients/drug addicts. In addition, Mr. Crowley testified that he worked long hours on the case and that he was on call to Mr. Carr and the prosecutor.

The Diversion Investigators who worked for Mr. Crowley while he was a Group Supervisor also worked on criminal investigations. Edward Sullivan was a Diversion Investigator in the Boston regional office of the DEA while Mr. Crowley was a Group Supervisor. In 1987, Mr. Sullivan began investigating a Dr. Robert Carson for violations of the Controlled Substances Act. Through a routine pharmacy survey, the Diversion Investigation Unit of the Massachusetts Police Department had discovered that Dr. Carson had been prescribing over 21,000 dosage units of Oxycodone and Hydromorphine to a married couple, Joyce and John Lori, who had been filing the prescriptions at numerous pharmacies in Massachusetts. Dr. Carson also had been mailing prescriptions to the Loris for no apparent medical purpose.

Mr. Sullivan teamed up with Trooper Peter Silva from the Massachusetts State Police and began to investigate the different pharmacies that were filling prescriptions from Dr. Carson. They found that three individuals, John and Joyce Lori and Thomas West, were receiving large quantities of prescrip-

tions from a number of pharmacies. Mr. Sullivan and Mr. Silva ultimately found that the prescriptions were being filled in numerous states: New York, New Jersey, Rhode Island and Massachusetts.

Upon discovering the broad, interstate scope of the criminal activity, Mr. Sullivan and Mr. Silva proposed that their investigation be classified as an Organized Crime Drug Enforcement Task Force (OCDETF). According to Mr. Sullivan, an OCDETF brings a number of different agencies under one directive to enforce the drug laws. The different agencies included the Customs Service, the Federal Bureau of Investigation, the Immigration and Naturalization Service, the Internal Revenue Service and the DEA. The proposal was approved.

Mr. Sullivan and Mr. Silva began interviewing the different suspects, including Dr. Carson, Joyce Lori and John Lori. Mrs. Lori told Mr. Sullivan that her husband had developed a heroin addiction while in Viet Nam and sold his pharmaceuticals at area bars to fund his heroin addiction. Mrs. Lori was afraid of her husband, whom she described as a big, very violent individual. Mr. Lori had threatened to kill his wife, who was estranged at the time, if she talked and, therefore, Mrs. Lori was placed in protective custody by the DEA. In the course of his investigation, Mr. Sullivan also interviewed a number of persons with associations to motorcycle gangs who were involved with "hard" drugs such as heroin, cocaine and LSD. Mr. Silva arrested Mr. Lori and Mr. West with Mr. Sullivan present.

Eventually, five persons, including Dr. Carson, Mr. Lori and Mr. West were indicted for conspiring to distribute large quantities of narcotics. Mr. Sullivan testified before the Grand Jury investigation. Ultimately, all six were convicted for conspiracy to violate the Controlled Substance Act and unlawful distribution of Schedule II narcotics.

During his investigation of Dr. Carson, Mr. Sullivan worked long hours. In addition, Mr. Sullivan was required to issue Miranda rights to a number of individuals. Mr. Sullivan Mirandized people using DEA Form 13–A, a form that Mr. Crowley had given him when he began at the DEA. Finally, Mr. Sullivan

testified that he was on call during his investigation of Dr. Carson, "because of the fact that at any, any time or any moment, that confidential informant [Joyce Lori] would contact Peter Silva, he, in turn, would contact me ... on occasion, with her, she felt as though her [life] was being threatened ...."

The testimony at trial discussed another OCDETF investigation, during 1987 and 1988, supervised by Mr. Crowley, which focused on the Cumberland Prescription Center of Rhode Island. A newspaper article had reported that, using an informant, Cumberland Police Detectives had discovered that the owner of the Cumberland Prescription Center, Michael Arouth, was dispensing drugs for sexual favors. The Cumberland police performed a search of the establishment and discovered boxes with markings on them that led Mr. Crowley to believe that the boxes had been surrendered to the state for destruction yet somehow ended up in the pharmacy.

The case was further developed by Diversion Investigator Janet Gardner and Special Agent Joseph Crowe. Mr. Crowley supervised Ms. Gardner during the investigation. According to Mr. Crowe, who testified at the trial, Ms. Gardner was the lead investigator and he assisted her because he knew the police officers involved in the investigation and because he had a good relationship with the United States Attorney's office in Providence, Rhode Island. Ms. Gardner took control of all of the evidence from the Cumberland Police Department.

Ms. Gardner and Mr. Crowe used a number of investigatory techniques in performing what Mr. Crowley described as "old gumshoe investigation." First, Ms. Gardner performed an administrative search on the premises, which was followed by a criminal search warrant. Mr. Crowe procured the search warrant and went with Ms. Gardner and Cumberland Police Officers to execute and perform the search. Mr. Crowe and two uniformed police officers executed the warrant, meaning that they told Mr. Arouth that they had a search warrant and that they were going to search the premises, while Ms. Gardner waited behind. According to Mr.

Crowe, Ms. Gardner did not join in executing the warrant because she was unarmed. Ms. Gardner, however, actually performed the search. In addition to administering search warrants, Ms. Gardner and Mr. Crowe also performed drive-by surveillance on suspects' homes. Finally, Ms. Gardner and Mr. Crowe interviewed three inspectors from the Rhode Island Drug Control Unit whom they suspected of providing narcotics to Mr. Arouth.

Ms. Gardner's investigation uncovered a conspiracy consisting of two source points and the key distributor, Mr. Arouth. One source consisted of three pharmacy inspectors, one narcotics inspector and one administrative clerk employed by the Rhode Island Department of Health, Diversion of Drug Control. This group was supplying Mr. Arouth with Percodan, Dilaudid and other prescription drugs surrendered by hospitals and nursing homes to the RIDH/DDC for destruction, which the group than stole. The second source for Mr. Arouth was a group of employees of the United Parcel Service (UPS). This group would steal drugs from the UPS delivery system.

Ultimately, a number of individuals were sentenced to prison for their role in the Cumberland Prescription Center conspiracy. Mr. Arouth pled guilty to five counts involving the possession with intent to distribute controlled substances and record keeping violations. He was sentenced to three years in prison. Richard P. Ferucci, a former Rhode Island Pharmacy Inspector, plead guilty to five counts of possession with intent to distribute controlled substances, conspiracy and tax evasion and was sentenced to five years in prison. In addition, John J. Barry, a retired Rhode Island Pharmacy Inspector, plead guilty to conspiracy to distribute Valium and filing false income tax returns. He was sentenced to six months in prison. Robert Johnson, a UPS manager, plead guilty to conspiracy to distribute Percodan and Dilaudid and distribution. He was sentenced to one year in prison.

Mr. Crowe testified that Ms. Gardner often worked ten to twelve hour days on the Cumberland case. In addition, Ms. Gardner was on call throughout the investigation of the case. Mr. Crowley stated that there was

"extra" danger involved in the case because Ms. Gardner was investigating armed agents of a state agency and working along side them at the same time as she was investigating them.

Another example of the type of criminal investigations performed by Diversion Investigators under Mr. Crowley's supervision was provided by Diversion Investigator Edward Harrington. Mr. Harrington testified regarding his investigation of the Frontier Pharmacy in South Deerfield, Massachusetts, during 1987 to 1989. Mr. Harrington learned, through informants and cooperative sources, that the pharmacist of the Frontier Pharmacy, William Rotkiewicz was selling drugs to area drug addicts. Initially, Mr. Harrington used an informant to buy drugs from Mr. Rotkiewicz using an obviously forged prescription. Mr. Harrington also suspected that the drugs from the Frontier Pharmacy were being sold at a bar in Vermont. Therefore, Mr. Harrington tried to use cooperating sources to make buys from suspects at the bar and the physician. Mr. Harrington testified that he gave detailed instructions to the informant before he went in to see the physician:

We, you know, we, basically, told him, when he entered the pharmacy, he had to do it in a certain way. He just couldn't go in with a prescription that looked real. So, basically, we had to write up the prescription not putting a full DEA number on there, making all sorts of obvious mistakes that any pharmacist would realize was a false prescription. We had to tell him how to talk to the pharmacist almost admitting this is a false prescription, and, so, the pharmacist is fully aware that he's giving someone drugs illegally.

Mr. Harrington was similarly explicit with the informant who was making drug buys from suspects at the bar in Vermont. Mr. Harrington told the informant to be sure to buy certain types of pills, such as Dilaudid or Percodan. They did not want him to go in and buy marijuana or cocaine.

Mr. Harrington monitored the buys from the pharmacy from the outside. On a couple of occasions, Mr. Harrington monitored the buys made inside the bar by going into the

bar to witness the transaction. After the informant completed the buys, Mr. Harrington would debrief him and take possession of any evidence.

The buys from the informants, however, were not successful in the Frontier Pharmacy case. Therefore, Mr. Harrington entered the pharmacy with a notice of inspection, performed an accounting of the pills the pharmacy had received compared to what was distributed, and also discovered a box of 248 apparently forged prescriptions which bore the signature of a doctor who was deceased. In addition to the accounting and search, Mr. Harrington also interviewed Mr. Rotkiewicz, who was suspected of violating the criminal laws of the United States at the time.

To investigate the legitimacy of the prescriptions that were found at the Frontier Pharmacy, Mr. Harrington interviewed approximately one hundred people who were named on the prescriptions. The process of interviewing these people took approximately a year and often required Mr. Harrington to travel to central Massachusetts from Boston. Some of the persons Mr. Harrington interviewed were elderly. Others, however, were "junkies" who lived in bad neighborhoods. Mr. Harrington testified that he was placed in hazardous situations when he was interviewing persons in those neighborhoods, and high crime areas. During the investigation, at the beginning of the week, Mr. Harrington would drive to Springfield and stay in a hotel, which served as a base of operations. While he was investigating the legitimacy of the prescriptions, Mr. Harrington would return to Springfield between 9:00 and 11:00 at night.

After finishing the investigation of the prescriptions, Mr. Harrington and the Assistant United States Attorney selected the best witnesses from the one hundred interviewed and presented them to a Grand Jury. At the Grand Jury, the prosecution presented a handwriting analysis of the prescriptions which showed that Mr. Rotkiewicz had forged almost all of the prescriptions himself. As a result, Mr. Rotkiewicz's DEA registration number was revoked.

After the DEA revoked Mr. Rotkiewicz's registration number, Mr. Harrington received information that he was continuing to order controlled drugs through a distributor in Long Island, New York. Consequently, Mr. Harrington traveled to Long Island to interview an executive from the distributor and learned that Mr. Rotkiewicz's daughter, who was also a pharmacist, had ordered the drugs. Mr. Harrington traveled back to Boston and went to Springfield that night. The following morning, Mr. Harrington wrote up an affidavit for a search warrant. It is not apparent from the record whether the warrant was for an administrative inspection or a criminal search. The following morning, Mr. Harrington served the search warrant.

Mr. Rotkiewicz was eventually charged with falsifying prescriptions and illegally dispensing controlled substances. Mr. Rotkiewicz's daughter was not charged. Mr. Rotkiewicz plead guilty to charges that he falsified ten prescriptions and to a single charge of unauthorized drug distribution. Mr. Rotkiewicz, age 67 at the time, was sentenced to one year of in-home detention and fined $40,000.00.

### III. Staff Coordinator Duty: 1991–1994

In the fall of 1990, Mr. Crowley received notice that he had been chosen by the Career Board to take up a position at DEA headquarters as a Staff Coordinator. The move was part of a rotation policy by which all supervisors from the field to perform a tour of duty at DEA Headquarters. When Mr. Crowley first arrived at DEA headquarters, he was assigned to the Domestic Drug Investigations Unit within the Drug Operations Section. Mr. Crowley's supervisor was Margaret Brophy. Ms. Brophy defined her duties as the unit chief at trial: "I was a unit chief that exercised oversight over all investigations being conducted by diversion investigators in the field. That could include as simple as a pre-registrant investigation to as complicated as a major criminal investigation." Ms. Brophy described Mr. Crowley's duties in the Domestic Drug Investigations Unit as follows:

As a staff coordinator, he would have been responsible for a certain number of divisions, and that means he would be monitoring and coordinating their investigations; he would be available to support them in funding and deciding whether a case should be part of a special enforcement program; he would be available to give them advice and guidance; he would review cases and decide if they were going in the right direction or is there a better way, maybe, we can do this. Duties of that nature.

As a Staff Coordinator, Mr. Crowley gave advice to Diversion Group Supervisors, and on occasion, Special Agent Group Supervisors and Special Agent Investigators. Ms. Brophy also testified regarding the practical requisites for Mr. Crowley's position:

Q. . . . [D]o you think that the job that you just described that Mr. Crowley was performing for you, do you think that position could have performed if he had not had criminal investigative experience?

A. No, it could not.

Q. Okay. Would you consider it to be a mandatory prerequisite for the job?

A. Yes.

Q. Let me know, Ms. Brophy, was it important to you, in having Mr. Crowley in your unit, whether or not he had served a warrant, a search warrant, for example?

A. It made the difference, in my opinion. You can't give advice if you haven't done it.

Q. If you haven't done it. Okay. Did it make any difference to you as to whether he had frequent and direct contact with criminals?

A. It made a difference. Again, he's giving advice to people in the field, and you want the investigator to give competent advice.

Q. And did it make a difference to you, in the work that Mr. Crowley did, as to whether he interrogated witnesses and suspects?

A. Yes.

\* \* \* \* \* \*

Q. Okay. Would it have been important to you that Mr. Crowley had given Miranda warnings, for example, in the field?

A. Yes.

Q. Why would that have been important?

A. Because you might have him giving advice to a relatively inexperienced field investigator on how to approach a particular instance, and he should have had that experience himself.

Q. How about experience with, say, undercover buys?

A. He should have been an expert on how you do an undercover buy from a registrant. You have to be very, very careful that you don't make an undercover buy where you're giving, say, a doctor a medical reason for selling you a prescription, and in the field, the diversion investigator is considered the expert, and the agent, in those instances, will discuss different scenarios with the investigator.

Q. Well, would it have been important to Mr. Crowley's position that he have experience in, with participating in searches?

A. Yes, it would.

Q. Why would that be important?

A. To know what type of evidence is germane to the type of case that you're hoping to have prosecuted, to have had the experience to know exactly what was involved, to know how to handle various types of evidence, including seizures, for instance, of PCs or personal computer records and—I think that's valid experience.

In the fall of 1991, a new unit, the International Drug Unit, was formed within the Drug Operations Section of the DEA. Larry Snyder, the chief of the new unit, selected Mr. Crowley from a group of Staff Coordinators to work in the new unit. Mr. Crowley began working as a Staff Coordinator in the International Drug Unit on October 1, 1991. According to Mr. Snyder, Mr. Crowley "coordinated criminal investigations that were ongoing in the International Drug Unit." Mr. Snyder testified that Mr. Crowley's background in criminal investigations was the "primary factor" in his decision to select Mr. Crowley for the International Drug Unit. Mr. Snyder testified that experience in criminal

investigations was a mandatory prerequisite for the position because, "the International Unit did not do any type of inspections or regulatory work. We only worked with drugs that were being smuggled in the United States, and you had to have a knowledge of criminal investigations to be able to coordinate other people who were conducting criminal investigations."

## IV. Diversion Group Supervisor Duty: 1994–2001

Mr. Crowley left DEA headquarters and returned to the DEA's Boston, Massachusetts regional office as a Group Supervisor on October 31, 1994. Similar to his prior experience as a Group Supervisor, from June of 1986 until February of 1991, Mr. Crowley supervised Diversion Investigators who were investigating criminals. JoAnn Masar, a Diversion Investigator who worked under Mr. Crowley briefly in 1991, and then again from 1994 until the end of March, 2001, testified that, other than two to four cyclic inspections a year, her time was devoted to criminal investigations. Ms. Masar testified regarding the High Street Gang case, an investigation that began in the fall of 1999, while Mr. Crowley was her group supervisor, and was ongoing at the time of trial. The High Street Gang case was initiated after a person died from an overdose of cocaine and Oxy-Contin, a Schedule II narcotic. Ms. Masar investigated an organization that was purchasing OxyContin and distributing it throughout southern Maine and New Hampshire. The organization was washing prescriptions with acetone to take the writing off and then rewriting the prescriptions themselves.

The High Street Gang investigation was a joint investigation with the Department of Health and Human Services, the Maine Drug Enforcement Agency, the Biddeford Police Department and, to a lesser degree, the Sanford Police Department. Ms. Masar testified that "[a]s far as DEA was concerned, I was the case investigator." Ms. Masar testified that the investigation began "with pharmacy records to see who was getting the OxyContin, and then we would go out and interview those people. All of those people had prior

records of, of drug offenses or they were known to the local departments as being involved in drug activity." In addition to interviews, Ms. Masar used undercover buys to investigate the High Street Gang case. "We, DEA supplied the money, which was me, paid the person who was making the buy, whether it was a police officer or an informant, and organized the buy with whoever was handling the informant." Ms. Masar also used confidential informants in the case. Due to a change in DEA policy, Ms. Masar was authorized to register informants, meaning she could recruit, pay and control the informants. Most of the informants that Ms. Masar used were suspected of having committed a federal crime. Finally, Ms. Masar used surveillance during the High Street Gang case. According to Ms. Masar, "some of the surveillance was in conjunction with the buy that was being done. It was a moving and stationary surveillance. It kind of changed in midstream, and I was in a vehicle with another, with a police officer."

During the High Street Gang investigation, Ms. Masar also assisted in making arrests and presenting information to the Grand Jury. Ms. Masar testified:

When we were effecting arrests, we did it early in the morning. A lot of times, it was around 5:00 in the morning. When we were getting ready for Grand Jury, because it was an ongoing process, we started Grand Jury in the beginning of last year and haven't stopped yet. Every couple of weeks, we indict more people.

Ms. Masar also testified about a case known as Operation Ox. The case began with a rash of pharmacy burglaries which appeared to be linked. A number of states were involved in the investigation: Maine, Massachusetts, Rhode Island, New York, New Jersey, Pennsylvania, Ohio and New Hampshire. The information collected by Ms. Masar indicated that a group of people in Lynn, Massachusetts were involved in the burglaries. Ms. Masar testified that "[s]ome of those drugs would, would be paid to the Hell's Angels Motorcycle Gang for, it's called 'tribute.' For tribute for doing business in their town; so that these burglars could sell

their drugs, and the rest of the drugs were going on the street."

The break in the case came when Ms. Masar was informed by a local police officer of a tip he received from a person who had been involved with a number of break-ins in the area. The informant was able to identify the individuals involved in the pharmacy burglaries from a security video tape taken during one of the break-ins in Rhode Island. The Rhode Island state authorities acquired search and arrest warrants, arrested the individuals, and incarcerated them. One of the defendants cooperated with Ms. Masar, and gave her additional information, which, when combined with the information she had already collected, lead her to a number of other targets. Ms. Masar testified with regard to the arrest of two of the suspects:

> [W]e also had another video tape of one of the burglaries, and we identified the person in that tape as being one of our suspects. We obtained a search warrant—it was a state search warrant—and an arrest warrant for those two individuals. We coordinated with New York, the local department. They came out, and we arrested the two individuals and conducted the searches of their residences.

Ms. Masar was the affiant for the search warrant, and physically conducted the search. Ms. Masar testified as to the general procedure she uses when conducting a search:

> I organize whoever I'm working with on a particular case. I organize them, give everybody jobs to do at the scene of the search, tell them what we need to locate. Have them, they have a copy of the affidavit so they can see what it is we're looking for. We go to the location, a warrant is handed to a law enforcement person to actual[ly] hand over, and they go in and secure the building, and then we conduct the search.

Ms. Masar testified that there were dangerous aspects to the investigation given that one of the main targets in the pharmacy burglaries was an enforcer for the Hell's Angels Motorcycle Gang who was on probation for assault. Ms. Masar arranged for this suspect's arrest with his probation offi-cer and, while she did not actually arrest him, she was present at the time. Ms. Masar also interrogated the suspect for a long period of time following the arrest. Furthermore, Ms. Masar testified that she worked long hours on Operation Ox and that she was on call twenty-four hours a day, due to the nature of the burglaries, which often occurred at night and during storms.

On April 1, 2001, Mr. Crowley was redesignated as a "Special Assistant." Mr. Crowley's duties as a "Special Assistant" were not discussed at trial.

## V. Mr. Crowley's Administrative Appeals

The Office of Personnel Management (OPM) has credited Mr. Crowley with primary Law Enforcement Officer coverage under 5 U.S.C. § 8331(20) from June 15, 1974 to June 15, 1986, secondary supervisory credit from June 16, 1986 to February 24, 1991, and secondary administrative credit from February 25, 1991 to September 30, 1991. This period includes Mr. Crowley's time as a Diversion Investigator, as a Diversion Investigator Group Supervisor and his time as a Staff Coordinator at the Domestic Drug Investigations Unit within the Drug Operations Section at DEA headquarters. By letter dated September 22, 1992, Mr. Crowley requested Law Enforcement Officer retirement coverage from October 1, 1991 to September 30, 1992. A year later, the government had not acted on Mr. Crowley's request for retirement coverage. By letter dated September 23, 1993, Mr. Crowley expanded his request for retirement coverage to include October 1, 1992 to September 30, 1993. In December 1993, the responsibility for determining creditable service was transferred from OPM to the relevant employing agency. In Mr. Crowley's case, the Justice Management Division (JMD), a division of the DOJ, acquired the responsibility for credit determinations. Also in 1993, the Merit Systems Protection Board, the Board responsible for reviewing JMD's decisions, adopted what it defined as a "significantly narrower" standard for defining Law Enforcement Officer credit. *See Bingaman v. Dep't of Treasury*, 127 F.3d 1431, 1438 (Fed. Cir.1997). The Board established a six part

test for determining whether an employee meets the definition of achieving Law Enforcement Officer status for purposes of entitlement to Law Enforcement Officer retirement credit. *See Hobbs v. OPM,* 58 M.S.P.R. 628, 633 n. 5 (1993). The MSPB published a number of subsequent decisions utilizing the narrower approach to determine eligibility for Law Enforcement Officer retirement credit. *See, e.g., Bremby v. Dep't of the Navy,* 81 M.S.P.R. 450, 453 (1999); *Taylor v. Dep't of Treasury,* 68 M.S.P.R. 693, 696 (1995), 106 F.3d 427 (Fed.Cir.1997); *Ferrier v. OPM,* 66 M.S.P.R. 241, 244 (1995); *Peek v. OPM,* 63 M.S.P.R. 430, 432 (1994), *aff'd* 59 F.3d 181 (Fed.Cir.1995) (table); *Sauser v. OPM,* 59 M.S.P.R. 489, 492 (1993). In *Bingaman v. Department of Treasury,* the United States Court of Appeals for the Federal Circuit affirmed the MSPB's adoption of the narrower standard, noting that "the set of factors the [MSPB] has developed captures the essence of what Congress intended." *Bingaman v. Dep't of Treasury,* 127 F.3d at 1436, 1438.

Following 1993, Mr. Crowley expanded his request to include each subsequent year. In a memorandum dated August 19, 1994, Jean D. Mathis, the Deputy Assistant Administrator for Personnel at the time, advised Stephen R. Colgate, the Assistant Attorney General for Administration, that Mr. Crowley's position as Staff Coordinator "has been determined by OPM to meet the law enforcement criteria; that is, it is an administrative position for which primary law enforcement experience is the prerequisite. Therefore, continued law enforcement coverage in the secondary category is recommended for DI Crowley." On July 9, 1999, Retha Fulmore, the Deputy Assistant Administrator for Personnel at the time, reversed the decision from OPM and advised that Mr. Crowley's position as a Staff Coordinator was not approved for Law Enforcement Officer credit. On August 16, 1999, JMD issued a final decision denying Mr. Crowley's requests for Law Enforcement Officer credit from October 1, 1991 through June 15, 1997.

Mr. Crowley did not receive overtime pay from 1974 to April of 1995. Mr. Crowley testified that he did not record the amount of overtime he was working because:

> The overtime budget for the rest of the employees [below GS–10] was very, very small, and if I, if I wrote down the hours for overtime, I wouldn't be paid anyways. So, it was, it was discouraged. I was told not to do it, and the same would hold true for compensatory time. There was, I was told there was no such thing.

In April of 1995, Mr. Crowley began receiving a limited amount of overtime, five hours of overtime pay a week, ten hours a pay period. Mr. Crowley testified, however, that he "worked a lot more than 10 hours per pay period overtime, but since I was used to doing that for so many years, I, I didn't, I didn't claim, you know, anything over and above what I could get under the system that we setup." Ms. Fulmore testified that within DEA, only Special Agents received AUO "because it has been determined that the nature of their work is uncontrollable. We cannot control when they will be required to work, and they receive AUO." Mr. Crowley, however, testified that "because of the nature of the investigations and the work that had to be done," the overtime he worked was uncontrollable. Diversion Investigators have never received availability pay.

Plaintiff currently seeks Law Enforcement Officer credit in the secondary administrative category from October 1, 1991 to October 30, 1994 and Law Enforcement Officer credit in the secondary supervisory category from October 31, 1994 to October 1, 2001. According to the briefs submitted by the plaintiff on the pre-trial motion, plaintiff argues that OPM's previous decision granting Mr. Crowley primary credit is sufficient to satisfy plaintiff's burden of demonstrating, for purposes of obtaining secondary Law Enforcement Officer credit, that he previously occupied a primary Law Enforcement Officer position. In support of Mr. Crowley's claim for Law Enforcement Officer credit, the plaintiff argues that "Mr. Crowley satisfies the condition in 5 U.S.C. § 8331(20) [ (2000) ] in that he was a law enforcement officer in a primary position as a Diversion Investigator in the Boston Diversion regional office from June 15, 1974 to June 15, 1986 and the duties of his position

were primarily the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States." In addition, the plaintiff contends that if OPM's previous decision granting Mr. Crowley primary credit is not given preclusive effect, the plaintiff still meets the new standard as expressed by the United States Court of Appeals for the Federal Circuit. Finally, plaintiff argues that because Mr. Crowley meets the definition of a "Law Enforcement Officer" under 5 U.S.C. § 8331(20), Mr. Crowley is entitled to the benefits which flow from Law Enforcement Officer status, including enhanced rates of pay pursuant to FLEPRA §§ 403 and 404. In addition, Mr. Crowley seeks overtime pay under 5 U.S.C. § 5542(a)(4), AUO pay under 5 U.S.C. § 5545(c)(2) from August 2, 1985 [14] to October 1, 2001, and availability pay under 5 U.S.C. § 5545a from 1994 to October 1, 2001.

In response, defendant argues that "Mr. Crowley is neither entitled to LEO credit nor to FLEPRA benefits." Regarding the plaintiff's claims for pay in excess of the forty hour work week, defendant contends that the plaintiff is not entitled to overtime pay pursuant to 5 U.S.C. § 5542(a)(4) (2000), AUO under 5 U.S.C. § 5545(c)(2), or availability pay pursuant to 5 U.S.C. § 5545a.

## DISCUSSION

■ As an initial matter, the court considers the issue raised by the parties' briefs submitted prior to trial. The parties jointly stipulated to the issue regarding what the plaintiff must prove to meet the transfer requirement of 5 C.F.R. § 831.904 (2001) as follows:

> [w]hether the previous decision of the Office of Personnel Management to grant plaintiffs primary law enforcement officer credit is sufficient to satisfy plaintiffs' burden of demonstrating, for purposes of obtaining secondary law enforcement officer credit, that they previously occupied a primary law enforcement officer position or

whether plaintiffs must demonstrate, through evidence of their primary job activities, that the primary position they occupied was a law enforcement officer position.

The parties each have raised several arguments to resolve this issue.

## I.  TRANSFER REQUIREMENT

The defendant argues that:

> the plain language in 5 C.F.R. § 831.904(a)(1), (2) (2001) requires, for entitlement to secondary coverage, that an employee have transferred into the secondary position *from a primary LEO position* (the transfer requirement). Thus, it is necessary to consider whether [Mr. Crowley was] in [a] primary LEO position[ ], and, under *Bingaman*,[15] this inquiry must be made using the *current* legal standard without regard to an earlier determination made under a previous standard. In short, OPM's decision to grant primary LEO credit to these individuals was based upon a legal standard that is no longer current, and that decision is not tantamount to a finding that they were primary LEOs under current law, which *Bingaman* requires.

(emphasis in original).

In contrast, the plaintiff argues that:

> The issue of primary time is not open on direct review. OPM long ago determined that the plaintiffs, Buckley and Crowley, had demonstrated that their duties in their primary positions were those of law enforcement officers. The plaintiffs should not be required to make that demonstration again under a standard that was not applicable at the time the decision was made . . . .
>
> On this basis the OPM decision may not be re-litigated.

In the controlling statute, a Law Enforcement Officer is defined as "an employee, the duties of whose position are primarily the investigation, apprehension, or detention of

---

14. See *supra* n. 6.

15. Now also under *Watson v. Department of the Navy,* 262 F.3d 1292 (Fed.Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 817, 151 L.Ed.2d

700 (2002), decided August 17, 2001, and *Hall v. Department of the Treasury,* 264 F.3d 1050 (Fed. Cir.2001), decided September 4, 2001.

individuals suspected or convicted of offenses against the criminal laws of the United States, including an employee engaged in this activity who is transferred to a supervisory or administrative position." 5 U.S.C. § 8331(20) (2000). Pursuant to 5 U.S.C. § 8347, OPM has issued regulations providing guidelines for determining entitlement to Law Enforcement Officer credit. *See* 5 C.F.R. §§ 831.901–831.914 (2002). The regulations at 5 C.F.R. § 831.904(a)(1) establish the transfer requirement for secondary credit eligibility as follows: "Employee is transferred directly (i.e., without a break in service exceeding 3 days) from a primary position to a secondary position ...." 5 C.F.R. § 831.904(a)(1). Thus, despite the fact that the plaintiff seeks only secondary credit, the conditions for earning secondary credit include a determination regarding whether the employee occupied a primary position.

Upon review of the plain language of the regulation, it is unclear whether the transfer requirement of § 831.904(a)(1) (2002) must be met each time an employee submits an application for Law Enforcement Officer credit to OPM, even if the employee has previously been deemed to have met the transfer requirement in prior determinations regarding eligibility for Law Enforcement Officer credit. Plaintiff argues that:

> once Mr. Crowley was credited with having transferred to a supervisory position as defined by 5 C.F.R. § 831.903(c)(3)(i) (1986), he should have been "deemed to have met the transfer requirements for all subsequent employment in supervisory/administrative law enforcement positions" pursuant to 5 C.F.R. § 831.903(d) (1986). The Court must therefore find that Mr. Crowley's service subsequent to 1986 is covered as a law enforcement officer pursuant to 5 C.F.R. § 831.903(c)(3)(i) (1986).

In response, defendant argues that:

> [T]he provision Mr. Crowley relies upon, 5 C.F.R. § 831.903(d), was last in effect in 1987 and therefore was *never in effect* at any time Mr. Crowley occupied the positions for which he currently seeks LEO credit (Mr. Crowley began his employment as Staff Coordinator of the International

Drug Unit in October 1991). Accordingly, former 5 C.F.R. § 831.903(d) at *no* time applied to Mr. Crowley's pending LEO claims, and there is no issue concerning applicability of retroactive regulations.

(Emphasis in original.) A review of the history of the regulation at issue shows that a previous determination that the employee has met the transfer requirement does not preclude the subsequent review of the transfer requirement for later applications. The version of 5 C.F.R. § 831.903(c)-(d) in effect from 1981 until 1987 provides:

> (c) "Law enforcement officer" also includes an employee who is transferred to a position the primary duties of which are not the investigation, apprehension, or detention of persons suspected or convicted of offenses against the criminal laws of the United States, ... if–
>
> (1) Service in the position transferred to follows service in a law enforcement position without–
>
> (i) A break in service of more than three days; or
>
> (ii) Intervening employment that was not as a law enforcement officer;
>
> (2) The duties of the position transferred to are in the law enforcement line of work in an organization with responsibility for the investigation, apprehension, or detention of persons suspected or convicted of offenses against the criminal laws of the United States; and
>
> (3) The position transferred to is–
>
> (i) Supervisory—one which requires a duty of supervising subordinate employees who are directly engaged in the investigation, apprehension, or detention of persons suspected or convicted of offenses against the criminal laws of the United States; or
>
> (ii) Administrative—one which includes an executive or managerial position and may include a clerical, technical, semiprofessional, or professional position of a type also found in organizations with no law enforcement responsibilities: *Provided,* That experience as a law enforcement officer is a basic qualification for the administrative position.

(d) A law enforcement officer, as defined in section 8331(20) of title 5, United States Code, who has transferred to a position identified by paragraph (c) of this section [which defines supervisory and administrative positions], under the conditions described in this paragraph, shall be deemed to have met the transfer requirements for all subsequent employment in supervisory/administrative law enforcement positions, except for any period of reemployment as an annuitant under title 5, United States Code, section 8335(b) or section 8336(c).

*See, e.g.,* 5. C.F.R. § 831.903(c)-(d) (1987). The applicable regulations issued after 1987 to the present do not contain the same transfer provisions or the provision which waives consideration of the transfer requirement when reviewing future applications for secondary credit if the employee has already met the transfer requirement.

The United States Supreme Court, in *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), discussed the time period during which regulations should be given effect. The *Bowen* Court stated: "Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Id.* at 209, 109 S.Ct. 468. However, an earlier case issued by the Supreme Court held that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley v. Sch. Bd. of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). The United States Court of Appeals for the Federal Circuit has considered the apparent inconsistency between *Bowen* and *Bradley* and decided to follow *Bowen,* stating that "[w]e prefer the longer-standing rule that retroactivity is not presumed." *Sargisson v. United States,* 913 F.2d 918, 923 (Fed.Cir.) *reh'g denied* (1990).

Moreover, · the United States Supreme Court recently considered whether a statute may be given retroactive effect and, after explicitly citing *Bowen,* held that "[a] statute may not be applied retroactively, however, absent a clear indication from Congress that it intended such a result." *INS v. St. Cyr,* 533 U.S. 289, 316, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). The *St. Cyr* Court also adopted a two-step analysis for determining whether a statute has an impermissible retroactive effect. *Id.* The first step involves ascertaining "whether Congress has directed with the requisite clarity that the law be applied retrospectively. The standard for finding such unambiguous direction is a demanding one." *Id.* (citation omitted). The second step "demands a commonsense, functional judgment about 'whether the new provision attaches new legal consequences to events completed before its enactment.' " *Id.* at 321, 121 S.Ct. 2271 (quoting *Martin v. Hadix,* 527 U.S. 343, 357–358, 119 S.Ct. 1998, 144 L.Ed.2d 347 (1999) (quoting *Landgraf v. USI Film Prods.,* 511 U.S. 244, 270, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994))). Rejecting retroactivity, the *St. Cyr* Court adopted the principle that " 'the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place ....' " *Id.* at 316, 121 S.Ct. 2271 (quoting *Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 855, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring)). The *St. Cyr* Court pointed out that: "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly ...." *Id.* Although the question presented by Mr. Crowley's employment history is more strictly one of prospectivity, instead of retroactivity, the underlying theories of how to achieve notice to all parties and, therefore, fairness, apply in both situations. The change in 5 C.F.R. § 831.903(d) after the revisions in 1988, so that the regulation no longer waived consideration of the transfer requirement when reviewing future applications for secondary credit if the employee already had met the transfer requirement, suggests a change in status regarding which provisions both parties had notice and under which provisions their conduct should be judged. *Compare* 5 C.F.R. § 831.903(c)-(d) (1987) *with* 5 C.F.R. § 831.904 (1988).

"In determining the meaning of such regulations, rules of interpretation applicable to statutes are appropriate tools of analysis." *Gen. Elec. Co. v. United States,* 221 Ct.Cl. 771, 778, 610 F.2d 730, 734 (1979); *accord Wronke v. Marsh,* 787 F.2d 1569, 1574 (Fed. Cir.) (stating that for the interpretation of regulations, just as in the interpretation of statutes, courts must begin with their plain language), *cert. denied,* 479 U.S. 853, 107 S.Ct. 188, 93 L.Ed.2d 121 (1986); *see also Rice v. Martin Marietta Corp.,* 13 F.3d 1563, 1568 (Fed.Cir.1993) (noting that the canon of statutory construction which states that "where the text permits, statutes dealing with similar subjects should be interpreted harmoniously" is "equally applicable" to regulations).

In the present case, neither the regulations at issue nor the authorizing statute discuss the time period during which the regulation will be applicable. In addition, the regulations from 1988 onward may deprive Mr. Crowley of the benefits of being deemed to have met the transfer requirements for the purposes of earning credit for future supervisory or administrative positions. Thus, applying a binding retroactive overlay from regulations issued after 1987 " 'takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past . . . .' " *INS v. St. Cyr,* 533 U.S. at 321, 121 S.Ct. 2271 (quoting *Landgraf v. USI Film Prods.,* 511 U.S. at 269, 114 S.Ct. 1483 (quoting *Soc'y for Propagation of the Gospel v. Wheeler,* 22 F.Cas. 756, 767 (C.C.D.N.H. 1814) (Story, J.))). However, even if the regulations at issue for 1988 to 2002, which do not contain the waiver provision, should not be applied retroactively, the benefits of the 1981 and 1987 regulations, which contain the provision waiving the consideration of the transfer requirements, would not apply to the present case because the transfer requirements were changed from 1988 forward.

Mr. Crowley's conduct which triggers the legal consequences imposed by the regulations occurs at multiple points in time. Mr.

Crowley transferred into a supervisory or an administrative position in 1986 (to group supervisor), in 1991 (to staff coordinator), and in 1994 (to group supervisor) pursuant to the regulations in effect during those periods of time. The times of the transfers are relevant to determine which regulations govern and if these transfers are sufficient for meeting the transfer requirement for all future applications for credit in supervisory or administrative positions. In 1988, the substance of the regulations was significantly revised. The 1988 version of the C.F.R. established and defined "primary positions" and "secondary positions" and set forth a different transfer requirement as follows: "Employee is transferred directly (i.e., without a break in service exceeding 3 days) from a primary position to a secondary position . . . ." 5 C.F.R. § 831.904(a)(1) (1988).

From 1988 through 2002, the regulations define a "primary position" as "a position whose primary duties are . . . investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States." *Compare* 5 C.F.R. § 831.902 (1988) *with* 5 C.F.R. § 831.902 (2002). A "secondary position" is defined as a position that:

(1) Is clearly in the law enforcement or firefighting field;

(2) Is in an organization having a law enforcement or firefighting mission; and

(3) Is either–

(i) Supervisory; i.e. a position whose primary duties are as a first-level supervisor of law enforcement officers or firefighters in primary positions; or

(ii) Administrative; i.e., an executive, managerial, technical, semiprofessional, or professional position for which experience in a primary law enforcement or firefighting position, or equivalent experience outside the Federal government, is a prerequisite.

*Compare* 5 C.F.R. § 831.902 (1988) *with* 5 C.F.R. § 831.902 (2002).[16]

Although the provision applicable before 1988, waiving consideration of the transfer

---

**16.** Although the numbering system for the subparts has been revised a number of times from 1988 until 2000, the substance of the regulations during this time period is identical.

requirements for "all subsequent employment in supervisory/administrative law enforcement positions," should apply prospectively once Mr. Crowley had transferred into a supervisory or administrative position, the transfer requirements which were imposed pre–1988, and which could be waived, were changed resulting in a new transfer requirement included in the regulations from 1988 to the present. *Compare* 5 C.F.R. § 831.903(d) (1987) *with* 5 C.F.R. 904(a)(1) (2002). From 1988 to the present, a different transfer requirement has been established—transfer from a primary position to a secondary position. *See, e.g.,* 5 C.F.R. 904(a)(1) (2002). The new definitions of primary and secondary positions result in different transfer requirements. For example, the new definition of a secondary position requires a transfer into a position that "[i]s clearly in the law enforcement or firefighting field" and is "in an organization having a law enforcement or firefighting mission." *See* 5 C.F.R. § 831.902. Moreover, the definition of an administrative secondary position significantly changed in 1988. Because of the changes in the transfer requirement in 1988, any waiver of the previous transfer requirement cannot fulfill the plaintiff's obligation to satisfy the current transfer requirement. The C.F.R. after 1988 has never contained a provision waiving the consideration of this new transfer requirement. Even if the waiver provision in effect from 1981 until 1987 applied to Mr. Crowley's applications for credit during that time period, this waiver provision does not permit Mr. Crowley to escape the current transfer requirement, and Mr. Crowley has the burden to prove that he meets the current transfer requirement, unless specifically grandfathered by statute or regulation.

Thus, the transfer requirement for obtaining secondary credit must include a determination that the employee previously occupied a primary position and had been transferred directly (within three days) from that primary position. Mr. Crowley's applications submitted in 1992 for secondary credit for work starting in 1991 until the present have not been decided and remain open on direct review. Mr. Crowley's occupation of a primary position is a requirement for obtaining secondary credit and interpretations of federal law apply retroactively to all open cases. Therefore, the pertinent statutes and regulations and, if applicable, the factors discussed in recent cases including *Hall v. Department of the Treasury*, 264 F.3d 1050 (Fed.Cir. 2001), *Watson v. Department of the Navy*, 262 F.3d 1292 (Fed.Cir.2001) and *Bingaman v. Department of the Treasury*, 127 F.3d 1431 (Fed.Cir.1997), which offer guidance on how to determine Law Enforcement Officer status, and which are discussed more fully below, are to be considered to determine whether Mr. Crowley was in an Law Enforcement Officer creditable primary position and, therefore, satisfies the transfer requirement for eligibility for secondary credit.

## II. JUDICIAL ESTOPPEL

█ Plaintiff argues that the principle of judicial estoppel should apply to preclude the government from taking the position that he is not entitled to primary Law Enforcement Officer credit, a position that he alleges is inconsistent with defendant's prior position regarding crediting primary time. Mr. Crowley previously was awarded and received primary Law Enforcement Officer credit from 1974 to 1986 and secondary credit from 1986 to 1991. The United States Court of Appeals for the Federal Circuit has explained the doctrine of judicial estoppel as follows:

> where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed. *Davis v. Wakelee*, 156 U.S. 680, 689, 15 S.Ct. 555, 558, 39 L.Ed. 578 (1895); *Wang Lab., Inc. v. Applied Computer Sciences, Inc.*, 958 F.2d 355, 358 (Fed.Cir.1992). Judicial estoppel is designed to prevent the perversion of the judicial process and, as such, is intended to protect the courts rather than the litigants. *See, e.g., Wang Lab., Inc.*, 958 F.2d at 359; *In re Cassidy*, 892 F.2d 637, 641 (7th Cir.), cert. denied, 498 U.S. 812, 111 S.Ct. 48, 112 L.Ed.2d 24 (1990) . . . .

*Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed.Cir.) *reh'g denied, en banc suggestion declined* (1996). A party has successfully asserted a position when that party has:

received a benefit from the previously taken position in the form of judicial success. *See Jackson Jordan, Inc. v. Plasser Am. Corp.*, 747 F.2d 1567, 1579, 224 USPQ 1, 10 (Fed.Cir.1984) ("In all precedent cited to us and which we have researched independently, the party against whom estoppel is invoked received some benefit from the previously taken position, i.e., he 'won' because of it.") ....

*Water Techs. Corp., v. Calco, Ltd.*, 850 F.2d 660, 665–66 (Fed.Cir.) *cert. denied* 488 U.S. 968, 109 S.Ct. 498, 102 L.Ed.2d 534 (1988).

■ In the present case, the government received no benefit from taking the position that the plaintiff was entitled to primary credit. The DEA and the OPM agreed with the plaintiff's application of the law, and the plaintiff was the one who benefitted from obtaining Law Enforcement Officer coverage. Furthermore, the defendant has not "urge[d] a particular position in a legal proceeding." *Data Gen. Corp. v. Johnson*, 78 F.3d at 1565. The plaintiff applied to the OPM through the DEA for Law Enforcement Officer credit, the DEA reviewed the plaintiff's request and recommended that the plaintiff's request be granted and the OPM determined that the plaintiff met the standard for receiving credit. At no point during this process regarding the plaintiff did the DEA or the OPM assert a position in a legal proceeding. The defendant also has asserted a good faith argument that the change in the legal position of the MSPB, as affirmed by the United States Court of Appeals for the Federal Circuit, supported the same change in position regarding the plaintiff's entitlement to primary Law Enforcement Officer credit. Accordingly, defendant's positions are not inherently contradictory because the change in the interpretation of the law regarding primary time by the MSPB, as affirmed by the Federal Circuit, was the DOJ's justification for adjusting its position at the administrative level. Thus, judicial estoppel does not preclude the defendant from taking the position that the plaintiff did not occupy a primary position under the current standard.

### III. COLLATERAL ESTOPPEL

Plaintiff also argues that "[c]ollateral estoppel requires that the Department of Justice be held to the decision recommended by the Department and made by OPM to grant plaintiffs primary law enforcement credit." In response, defendant contends that *"actual litigation* is necessary for the doctrine of collateral estoppel to be applicable" and that "the plaintiffs here received their primary credit without litigation; OPM voluntarily granted the plaintiffs' application for LEO credit without litigating the matter." (Emphasis in original).

Defendant argues that "the Supreme Court's decision in [*Commissioner v.*] *Sunnen* unequivocally states that collateral estoppel does not apply for future purposes when there has been a change in controlling legal principles." In *Commissioner v. Sunnen*, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948), the Court considered whether a 1935 determination of tax liability on royalties from a 1928 license contract would preclude the determination of tax liability on royalties based on the 1928 contract and other contracts, all distributed after a change in the law. In finding that collateral estoppel would not preclude the re-litigation of tax liability on royalties distributed after the change in law, the Court held that "a subsequent modification of the significant facts or a change or development in the controlling legal principles may make [a previous] determination obsolete or erroneous, at least for future purposes." *Id.* at 599, 68 S.Ct. 715. However, the Court also acknowledged that an issue that was essential to the previous judgment and actually determined in the previous proceeding will bind a court in a subsequent proceeding even under a different cause of action. *Id.* at 601, 68 S.Ct. 715. Regarding a change in the facts, the *Sunnen* Court detailed the situations in which collateral estoppel would not apply:

[i]f the relevant facts in the two cases are separable, even though they be similar or identical, collateral estoppel does not govern the legal issues which recur in the second case. Thus the second proceeding may involve an instrument or transaction identical with, but in a form separable

from, the one dealt with in the first proceeding. In that situation, a court is free in the second proceeding to make an independent examination of the legal matters at issue. It may then reach a different result . . . .

*Id.* (footnote omitted). Thus, the Court reasoned that separable facts or instruments or transactions in separable form would defeat the application of collateral estoppel in a subsequent proceeding.

The defendant relies on the United States Court of Appeals for the Federal Circuit decision in *Bingaman v. Department of Treasury,* 127 F.3d 1431 (Fed.Cir.1997) in support of its argument that collateral estoppel does not apply in this case. In *Bingaman,* the plaintiff received primary Law Enforcement Officer credit for his services from February 28, 1989 through July 15, 1993. He subsequently filed a request for primary Law Enforcement Officer credit for his services from July 15, 1993 through July 13, 1994. The United States Court of Appeals for the Federal Circuit in *Bingaman v. Department of Treasury* affirmed the MSPB's decision upholding the agency's denial of Bingaman's claim for primary Law Enforcement Officer credit, even though the plaintiff had previously received primary Law Enforcement Officer credit for services performed as a Customs Service employee during an earlier time period. *Id.* at 1436–38. The *Bingaman* court held that the previous grant of Law Enforcement Officer credit to the plaintiff did not serve to bar the consideration of primary credit during a subsequent time period. *Id.* at 1436–38. In holding that collateral estoppel did not apply, the *Bingaman* court relied on an exception to the collateral estoppel principle which arises when "there has been a change in the applicable law between the time of the original decision and the subsequent litigation in which collateral estoppel is invoked." *Id.* at 1437. Referring to changes in MSPB case law, the *Bingaman* court wrote that "there has been a sufficient change in the 'legal atmosphere' with respect to the issue of LEO retirement credit that the bar of collateral estoppel should not be applied in this case." *Id.* at 1438.

"The doctrine of collateral estoppel, or issue preclusion, serves to bar the revisiting of issues that have already been litigated by the same parties or their privies based on the same cause of action." *Banner v. United States,* 238 F.3d 1348, 1354 (Fed.Cir.2001). Collateral estoppel "relieve[s] parties of the cost and vexation of multiple lawsuits, conserve[s] judicial resources, and, by preventing inconsistent decisions, encourage[s] reliance on adjudication." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) (citing *Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)). "Collateral estoppel requires four factors: (1) the issues are identical to those in a prior proceeding, (2) the issues were actually litigated, (3) the determination of the issues was necessary to the resulting judgment, and (4) the party defending against preclusion had a full and fair opportunity to litigate the issues." *Banner v. United States,* 238 F.3d at 1354 (citing *Jet, Inc. v. Sewage Aeration Sys.,* 223 F.3d 1360, 1365–66 (Fed.Cir.2000)).

Previously determined agency decisions may be given preclusive effect in subsequent lawsuits brought in federal courts. *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). "When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose." *Id.* (citing *Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263 (1940)). The United States Supreme Court also endorsed giving collateral estoppel effect to administrative factfinding in *University of Tennessee v. Elliott,* 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986). The Court stated:

Thus, *Utah Construction,* which we subsequently approved in *Kremer v. Chemical Construction Co[rp].,* 456 U.S. [461], 484–485, n. 26, 102 S.Ct. [1883], 1899, n. 26, 72 L.Ed.2d 262 [(1982)], teaches that giving preclusive effect to administrative factfinding serves the value underlying general principles of collateral estoppel: enforcing

repose. This value, which encompasses both the parties' interest in avoiding the cost and vexation of repetitive litigation and the public's interest in conserving judicial resources, *Allen v. McCurry*, 449 U.S., at 94, 101 S.Ct., at 414, is equally implicated whether factfinding is done by a federal or state agency.

*Id.* at 798, 106 S.Ct. 3220; *see also Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991). "An issue on which relitigation is foreclosed may be one of evidentiary fact, of 'ultimate fact' (i.e., the application of law to fact), or of law." Restatement (Second) of Judgments, § 27 cmt. c (1982).

■ In determining whether an agency has acted in a judicial capacity, the United States Court of Appeals for the Seventh Circuit has offered useful guidance to identify the safeguards which indicate the requisite judicial capacity: "(1) representation by counsel, (2) pretrial discovery, (3) the opportunity to present memoranda of law, (4) examinations and cross-examinations at the hearing, (5) the opportunity to introduce exhibits, (6) the chance to object to evidence at the hearing, and (7) final findings of fact and conclusions of law." *Reed v. AMAX Coal Co.*, 971 F.2d 1295, 1300 (7th Cir.1992) (per curiam). Other courts have held that an agency decision will not be given collateral estoppel effect if the agency proceeding lacked certain characteristics utilized in court proceedings. *See also Delamater v. Schweiker*, 721 F.2d 50, 53–54 (2d Cir.1983) (finding that "[a]n action taken by an administrative agency to grant or deny a benefit is not an adjudicated action unless the agency has made its decision using procedures substantially similar to those employed by the courts" and that an administrative decision in which "[t]here was no hearing, no testimony, no subpoenaed evidence, no argument, no opportunity to test any contention by confrontation" would not be given preclusive effect); *Howard v. United States*, 497 F.2d 1270, 1272 (7th Cir.1974) (finding that the Internal Revenue Service's (IRS) determination which failed to result in a disallowance of the plaintiffs' claimed theft loss was not "judicial in nature but administrative" and did not preclude the IRS from reconsidering the taxpayer's liability). In *Nasem v. Brown*, 595 F.2d 801 (D.C.Cir.1979), the United States Court of Appeals for the District of Columbia Circuit considered whether to give collateral estoppel effect to an agency decision regarding a reprisal claim. The complainant had filed a written charge containing all facts pertinent to the alleged reprisal within fifteen days of the alleged occurrence and within fifteen days thereafter, the employer agency had investigated the charge and filed its response with the agency pursuant to 5 C.F.R. § 713.262(b)(1). *Id.* at 806–07. Based on the procedures established at the administrative level, particularly the inability of the parties to present live witness testimony in a case which turned on retaliatory motivation, the *Nasem* court found that the administrative decision did not collaterally estop the District Court from reconsidering the plaintiff's reprisal claim because the procedures involved did "not provide procedural safeguards contemplated by *Utah Construction*." *Id.* at 807.

The OPM, a federal executive branch agency, credited Mr. Crowley with primary Law Enforcement Officer retirement coverage under 5 U.S.C. §§ 8331(20) and 8336(c) from June 15, 1974 until June 15, 1986, and secondary Law Enforcement Officer retirement coverage from June 16, 1986 until September 30, 1991. Plaintiff currently seeks secondary administrative credit from October 1, 1991 to October 30, 1994 and secondary supervisory credit from October 31, 1994 to October 1, 2001.

In Mr. Crowley's case, the procedures followed by OPM in granting primary and secondary credit to the plaintiff from 1974 until 1991 do not demonstrate that OPM acted in a judicial capacity. Under the Code of Federal Regulation sections in effect at the time that Mr. Crowley was granted Law Enforcement Officer credit, an employee could submit an individual request to the employing agency for a determination of whether the employee's position qualified as a primary or secondary position. *See* 5 C.F.R. § 831.905(b)(1)(ii) (1984); 5 C.F.R. § 831.908(b) (1992). Once the employee submitted his or her application, a DEA official would review the employee's application and

submit an advisory opinion to OPM. *See* 5 C.F.R. § 831.908(b) (1992). After reviewing the employee's application, including any documentary evidence and DEA's recommendation, OPM would issue a final determination based on the papers. 5 C.F.R. § 831.909. The plaintiff does not claim that either the employee or the DEA ever had the opportunity to conduct pretrial discovery, present memoranda of law, conduct examinations or cross-examinations of witnesses, introduce exhibits, or object to any evidence presented. In fact, the procedures employed at the administrative level to determine whether Mr. Crowley qualified for Law Enforcement Officer credit from 1974 until 1991 are similar to the procedures followed in *Nasem v. Brown,* which the *Nasem* court found inadequate to show that the agency had acted in a judicial capacity. 595 F.2d at 807. Because the procedures employed at the administrative level did not contain judicial-type procedures, which ensure that the issues presented are fully explored or litigated, the court finds that OPM did not act in a judicial capacity and no judicial-like proceeding was held regarding Mr. Crowley's claims. OPM's decision granting Mr. Crowley primary and secondary credit from 1974 until 1991, nor MSPB's dismissal of Mr. Crowley's appeal to the MSPB without prejudice, and prior to any proceeding on the merits, does not preclude the court from reconsidering whether Mr. Crowley occupied a primary position when he served as a Diversion Investigator from 1974 to 1986 and whether he occupied secondary positions from 1986 until 1991.

In the present case, as part of the court's consideration of the plaintiff's entitlement to secondary credit, the court must consider whether the plaintiff occupied a primary position for the purposes of the transfer requirement of 5 C.F.R. § 831.904 (2002). Thus, a change in the legal atmosphere regarding determinations of primary credit could effect a change regarding determinations of secondary credit. In *Bingaman,* the United States Court of Appeals for the Federal Circuit noted the significant change of standards at the MSPB and utilized in decisions issued by that Board regarding Law Enforcement Officer credit. 127 F.3d at 1437. The MSPB decisions, however, do not

serve as binding precedent for this court, although, of course, decisions issued by the United States Court of Appeals for the Federal Circuit do bind this court. The MSPB decisions reviewed by the Federal Circuit were significantly fact bound and the appellate review by the Federal Circuit was focused on whether each of the decisions issued by the MSPB was arbitrary, capricious or not in accordance with the law. In each of the key Federal Circuit cases reported, the appellate court held that the MSPB's finding respecting eligibility for Law Enforcement Officer credit was not arbitrary, capricious or otherwise not in accordance with law. In other words, in each of those cases, based on the factual record, the plaintiff failed to meet the burden to establish reversible error by the Board. *See, e.g., Hall v. Dep't of the Treasury,* 264 F.3d at 1054.

Moreover, with respect to determining eligibility for Law Enforcement Officer credit, direction from the Federal Circuit on how to follow their guidance remains somewhat undefined. The key cases decided by the court in which opinions were issued appear to establish exemplary, non-binding guidelines from which the finder of fact can choose, depending on the individual facts of the case, to assist in application of the statutory definition when determining eligibility for Law Enforcement Officer credit. The Federal Circuit decisions do not dictate that the factors considered in *Bingaman, Hannon, Watson* or *Hall* must be applied to every case considering an employee's eligibility for Law Enforcement Officer credit, including eligibility in different work assignments or those arising in this court, as opposed to at the MSPB. In *Hall v. Department of the Treasury,* the court wrote:

> [a]s we stated in *Hannon,* the evaluation of and weight to be given to the various *Bingaman* considerations and the other evidence in the record are judgment calls that rest primarily within the direction of the Board.... [I]t is not our function to substitute our judgment for that of the agency [finder of fact] regarding the weight to be given to those considerations.

264 F.3d at 1060 (citing *Hannon v. Dep't of Justice,* 234 F.3d at 681). In *Watson v.*

*Department of the Navy,* 262 F.3d 1292, the court explicitly held that "[t]his court, however, has never adopted the *Bingaman* factors; nor has the court held that federal employees are always entitled to LEO coverage so long as they satisfy the *Bingaman* factors." *Watson v. Dep't of Navy,* 262 F.3d at 1301. In addition, the *Watson* court, when listing the factors it considered in deciding the case, stated that the five factors it was setting forth were the "most probative factors," but not required factors to be considered in every case involving Law Enforcement Officer credit. *Id.* at 1302. In *Hall v. Department of the Treasury,* the court wrote, "[n]o single factor is essential or dispositive." 264 F.3d at 1056–57. As is discussed more fully below in an in depth discussion of the governing statute, regulations and the *Hobbs,* Bingaman, *Hannon,* Watson, and *Hall* cases, this court does not believe that the applicable governing law for this court has significantly changed from the statutory definition. Thus, the exception to collateral estoppel principles invoked by the defendant would not prevent the application of collateral estoppel, if it was otherwise appropriate.

Furthermore, with respect to the application of collateral estoppel regarding whether Mr. Crowley occupied a primary position, the record does not contain any facts, instrument, or transaction of a form separable from the previous determinations of Mr. Crowley entitlement to primary credit. In *Bingaman,* the facts considered in the later proceeding were clearly separable because the employee sought an award of primary credit for a different time period. *Bingaman v. Dep't of Treasury,* 127 F.3d at 1434. Although the employee's job description and duties may have been materially identical, Bingaman's duties for the period July 15, 1993 through July 13, 1994, were clearly separable from Bingaman's duties for the period from February 28, 1989 through July 15, 1993. Likewise, in *Commissioner v. Sunnen,* 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898, the royalties paid pursuant to the 1928 license contract were separable from the royalties paid pursuant to later license contracts. 333 U.S. at 602, 68 S.Ct. 715. Additionally, in *Sunnen,* the royalties paid pursuant to the 1928 contract that were distributed from 1928

1929 to 1931 were separable from the royalties paid pursuant to the same contract, but distributed in 1937. *See id.* at 595–96, 68 S.Ct. 715.

In the present case the facts considered by this court are not separable from the facts considered by the OPM in 1974 through 1991 when it granted Mr. Crowley primary credit. If this court were to consider Mr. Crowley's eligibility for primary credit, it would consider the very same facts considered by OPM in its determination regarding Mr. Crowley's primary credit—namely, Mr. Crowley's job description and responsibilities from June 15, 1974 to June 15, 1986. None of the facts relevant to Mr. Crowley's entitlement to primary credit have changed, and if collateral estoppel were otherwise appropriate, this court would not reconsider a final decision made on identical facts that are not separable in any way, shape, or form. In Mr. Crowley's case, however, there has been no action by an administrative agency acting in a judicial capacity to resolve issues of fact properly before it in a situation in which the parties have had an adequate opportunity to litigate. *See United States v. Utah Constr. and Mining Co.,* 384 U.S. at 422, 86 S.Ct. 1545. Thus, collateral estoppel is inappropriate.

## IV.  MR. CROWLEY'S CLAIMS

As discussed above, the rules of statutory construction are applicable to the interpretation of administrative regulations. These rules of statutory construction, therefore, will be used to interpret the relevant statute and the regulations in the present case. The court's analysis begins with the plain language of the statute. *Duncan v. Walker,* 533 U.S. 167, 172, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001); *Carter v. United States,* 530 U.S. 255, 257, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000). In interpreting the plain meaning of the statute, it is the court's duty, if possible, to give meaning to every clause and word of the statute. *Duncan v. Walker,* 533 U.S. at 167, 121 S.Ct. 2120; *Williams v. Taylor,* 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (describing as a "cardinal principle of statutory construction" the rule that every clause and word of a statute must be given effect if possible). Similarly, the court must

avoid an interpretation of a clause or word which renders other provisions of the statute inconsistent, meaningless, or superfluous. *Duncan v. Walker*, 533 U.S. at 174, 121 S.Ct. 2120 (noting that court's should not treat statutory terms as "surplusage"). " '[W]hen two statutes are capable of co-existence ... it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.' " *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 533, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995) (quoting *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)); *Hanlin v. United States*, 214 F.3d 1319, 1321 (Fed.Cir.), *reh'g denied* (2000).

A court must not stray from the statutory definition of a term. *See Stenberg v. Carhart*, 530 U.S. 914, 942, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000); *Meese v. Keene*, 481 U.S. 465, 484–485, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987); *Colautti v. Franklin*, 439 U.S. 379, 392 n. 10, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979). "It is axiomatic that the statutory definition of the term excludes unstated meanings of that term." *Meese v. Keene*, 481 U.S. at 484–85, 107 S.Ct. 1862. As the United States Court of Appeals for the Federal Circuit stated in *AK Steel Corp. v. United States:*

> When Congress makes such a clear statement as to how categories are to be defined and distinguished, neither the agency nor the courts are permitted to substitute their own definition for that of Congress, regardless of how close the substitute definition may come to achieving the same result as the statutory definition, or perhaps a result that is arguably better.

226 F.3d 1361, 1372 (Fed.Cir.2000). When a word is undefined, court's regularly give that term its ordinary meaning. *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995); *AK Steel Corp. v. United States*, 226 F.3d at 1371.

A singular term, however, may not be read in isolation. *See Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 852, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001) (citing *Gade v. Nat'l Solid Wastes Mgmt. Assn.*, 505 U.S. 88, 99, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992)).

The "meaning of a provision is 'clarified by the remainder of the statutory scheme ....' " *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 217–18, 121 S.Ct. 1433, 149 L.Ed.2d 401 (2001) (quoting *United Sav. Assn. of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) and describing statutory construction as a "holistic endeavor"). "Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used." *King v. Saint Vincent's Hosp.*, 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) (quoting *NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir. 1941) (L.Hand, J.)).

When the statute provides a clear answer, the court's analysis is at an end. *Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 254, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000) (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999)). Thus, when the " 'statute's language is plain, "the sole function of the courts is to enforce it according to its terms." ' " *Johnson v. United States*, 529 U.S. 694, 723, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000) (quoting *United States v. Ron Pair Enterps., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917))). In such an instance, the court will not consider "conflicting agency pronouncements" or "extrinsic evidence of a contrary intent." *Weddel v. Sec'y of Dep't of Health and Human Servs.*, 23 F.3d 388, 391 (Fed. Cir.1994) (citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) (noting that a court must not defer to agency interpretation contrary to intent of Congress evidenced by unambiguous language) and *Darby v. Cisneros*, 509 U.S. 137, 147, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993)). "[O]nly language that meets the constitutional requirements of bicameralism and presentment has true legal authority." *Weddel v. Sec'y of Dep't of Health and Human Servs.*, 23 F.3d at 391.

(citing *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983)). "'[C]ourts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point.'" *Shannon v. United States,* 512 U.S. 573, 583–84, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994) (quoting *Int'l Bhd. of Elec. Workers, Local Union No. 474 v. NLRB,* 814 F.2d 697, 712 (D.C.Cir.1987)). Consequently, if a statute is plain and unequivocal on its face, there is usually no need to resort to the legislative history underlying the statute. *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 119, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) (citing *Ratzlaf v. United States,* 510 U.S. 135, 147–148, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear.")).

There are select instances when resorting to legislative history is proper. For example, a court may consider legislative history if: the plain meaning produces a result that is not just "harsh," *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 576, 102 S.Ct. 3245, 3252, 73 L.Ed.2d 973 (1982), "curious," *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 172, 98 S.Ct. 2279, 2291, 57 L.Ed.2d 117 (1978), or even "stark and troubling," *Estate of Cowart,* 505 U.S. at [483], 112 S.Ct. at 259[8], but "so bizarre that Congress 'could not have intended' it," *Demarest v. Manspeaker,* 498 U.S. 184, 186, 190–91, 111 S.Ct. 599, 601–02, 603–04, 112 L.Ed.2d 608 (1991).

*Weddel v. Sec'y of Dep't of Health and Human Servs.,* 23 F.3d at 391. Moreover, legislative history may be introduced into the analysis to resolve an ambiguous statute. *Ratzlaf v. United States,* 510 U.S. at 148 n. 18, 114 S.Ct. 655 (citing *Barnhill v. Johnson,* 503 U.S. 393, 401, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992)); *Patterson v. Shumate,* 504 U.S. 753, 761, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992).

"If legislative history is to be considered, it is preferable to consult the documents prepared by Congress when deliberating." *Gustafson v. Alloyd Co.,* 513 U.S. 561, 580, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). "[T]he authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation.'" *Garcia v. United States,* 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) (quoting *Zuber v. Allen,* 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969)), *reh'g denied* 469 U.S. 1230, 105 S.Ct. 1235, 84 L.Ed.2d 371 (1985). "'[T]he fears and doubts of the opposition are no authoritative guide to the construction of legislation'" because of the likelihood that those in opposition tend to overstate the reach of the bill in question. *Bryan v. United States,* 524 U.S. 184, 196, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998) (quoting *Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S. 384, 394, 71 S.Ct. 745, 95 L.Ed. 1035 (1951)). Moreover, statements by individual legislators should not be given controlling weight, although such statements may evidence congressional intent when consistent with statutory language and other pieces of legislative history. *Brock v. Pierce County,* 476 U.S. 253, 263, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986) (citing *Grove City Coll. v. Bell,* 465 U.S. 555, 567, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984)).

"'[S]ubsequent history is less illuminating than the contemporaneous evidence.'" *Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs,* 531 U.S. 159, 170, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) (quoting *Hagen v. Utah,* 510 U.S. 399, 420, 114 S.Ct. 958, 127 L.Ed.2d 252, *reh'g denied,* 511 U.S. 1047, 114 S.Ct. 1580, 128 L.Ed.2d 222 (1994); *see also United States v. X-Citement Video, Inc.,* 513 U.S. 64, 77, n. 6, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994)) ("[T]he views of one Congress as to the meaning of an Act passed by an earlier Congress are not ordinarily of great weight ... and the views of the committee of one House of another Congress are of even less weight."). *But cf. Loving v. United States,* 517 U.S. 748, 770, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996) ("'"Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction."'") (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 118 n. 13, 100 S.Ct. 2051, 64

L.Ed.2d 766 (1980) (quoting *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 380–81, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969))). In this regard, a court should give little weight to attempts to infer Congressional intent to adopt judicial interpretations of a statutory provision when Congress revises the statutory scheme, but fails to amend the provision in question. *See Alexander v. Sandoval*, 532 U.S. 275, 292, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). Similarly, " 'failed legislative proposals are "a particularly dangerous ground on which to rest an interpretation of a prior statute." ' " *Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs*, 531 U.S. at 170, 121 S.Ct. 675 (quoting *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579, (1990))).

Thus, in the instant case, when determining entitlement to Law Enforcement Officer credit, the court begins with the plain language of the statute and the regulations. Mr. Crowley claims that he is entitled to Law Enforcement Officer credit in the secondary administrative category for the Staff Coordinator position he held from October 1, 1991 to October 30, 1994, and for Law Enforcement Officer credit in the secondary supervisory category for the Group Supervisor position he has held from October 31, 1994 to April 1, 2001. To prove his eligibility for a special rate of pay under FLEPRA section 403, 5 U.S.C. § 5305 note (2000), a special pay adjustment under FLEPRA section 404, 5 U.S.C. § 5305 note, and premium pay pursuant to FLEPRA section 410, 5 U.S.C. §§ 5542, *see also* § 5547, the plaintiff must meet a threshold requirement of demonstrating that he has Law Enforcement Officer status.

As defined by the applicable statute, a "law enforcement officer" means "an employee, the duties of whose position are primarily the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States, including an employee engaged in this activity who is transferred to a supervisory or administrative position." 5 U.S.C. § 8331(20) (2000). The regulations governing determinations of Law Enforcement Officer credit reiterate the definition set forth in 5 U.S.C. § 8331(20) and supplement the statutory definition by providing: "The definition does not include an employee whose primary duties involve maintaining law and order, protecting life and property, guarding against or inspecting for violations of law, or investigating persons other than persons who are suspected or convicted of offenses against the criminal laws of the United States." 5 C.F.R. § 831.902 (2002).[17]

The regulations also define "primary duties" as those duties which: (1) "Are paramount in influence or weight; that is, constitute the basic reasons for the existence of the position;" (2) "[o]ccupy a substantial portion of the individual's working time over a typical work cycle;" and (3) "[a]re assigned on a regular and recurring basis." 5 C.F.R. § 831.902 (2002). Moreover, "[d]uties that are of an emergency, incidental, or temporary nature cannot be considered 'primary' even if they meet the substantial portion of time criterion." *Id.* The versions of the C.F.R. issued from 1991 until the present also provide the following additional guidance: "In general, if an employee spends an average of at least 50 percent of his or her time performing a duty or group of duties, they are his or her primary duties." *See, e.g.*, 5 C.F.R. § 831.902 (2002). The fifty percent standard set forth after 1991 is consistent with the rest of the regulation, and the court finds that this standard is helpful for determining whether the duties required by the statute were Mr. Crowley's primary duties.

A secondary position is defined as a position that:

(1) Is clearly in the law enforcement or firefighting field;

(2) is in an organization having a law enforcement or firefighting mission; and

(3) Is either—

---

17. This regulation was promulgated on December 17, 1987. *See* Subpart I—Law Enforcement Officers and Firefighters, 52 Fed.Reg. 47,894 (Dec. 17, 1987) (codified at 5 C.F.R. § 831.902).

(i) Supervisory; i.e., a position whose primary duties are as a first-level supervisor of law enforcement officers or firefighters in primary positions; or

(ii) Administrative; i.e., an executive, managerial, technical, semiprofessional, or professional position for which experience in a primary law enforcement or firefighting position, or equivalent experience outside the Federal government, is a prerequisite.

5 C.F.R. § 831.902.

In addition to proving that he occupies a secondary position, the plaintiff must also meet the following criteria: (1) the employee is transferred directly (i.e., without a break in service exceeding three days) from a primary position to a secondary position; and (2) if applicable, the employee has been continuously employed in secondary positions since transferring from a primary position without a break in service exceeding three days. 5 C.F.R. § 831.904(a)(1)-(2). As noted above, to meet the transfer requirement, the plaintiff must show that he occupied a primary position. A "primary position" means a position whose primary duties are: "Investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States." 5 C.F.R. § 831.902.

"An employee who requests credit for service under 5 U.S.C. § 8336(c) bears the burden of proof with respect to that service . . . ." 5 C.F.R. § 831.906(a) (2002).[18] In addition, beginning in 1990, coverage "in a position or credit for past service will not be granted for a period greater than 1 year prior to the date that the request from an individual is received . . . by the employing agency, the agency where past service was performed, or OPM." 5 C.F.R. § 831.906(e) (2001).[19]

### A. Break in Service

For entitlement to Law Enforcement Officer credit, Mr. Crowley must show that there were no voluntary breaks in service exceeding three days between any of the transfers Mr. Crowley made, including from his primary position to his secondary position and between his various secondary positions. Mr. Crowley testified that there were no breaks in his service throughout his DEA career between any of the various positions he has held within DEA since 1974. No contrary evidence has been presented to the court. Therefore, the court finds that Mr. Crowley was continuously employed in a position within DEA from 1974 until he retired on October 1, 2001.

### B. Primary Position

■ To meet the transfer requirement for secondary credit, the plaintiff must prove that he occupied a primary position and that he transferred directly from that primary position into a secondary position. 5 C.F.R. § 831.904(a) (2002). To show that he occupied a primary position, the plaintiff must show that his primary duties meet the definition of law enforcement officer, namely the "[i]nvestigation, apprehension, *or* detention of individuals suspected or convicted of offenses against the criminal laws of the United States." 5 C.F.R. § 831.902 (emphasis added). This definition is identical to the definition established in 5 U.S.C. § 8331(20) (2000), which sets forth the definition of a "law enforcement officer." Notably, both the applicable statute and regulations use the disjunctive "or" in the language chosen. In *Felzien v. OPM*, 930 F.2d 898 (Fed.Cir.1991), the United States Court of Appeals for the Federal Circuit discussed the use of the word "or" in 5 U.S.C. § 8331(21) (1988), as it related to the standard for entitlement to preferential credit for a firefighter. The *Felzien* court stated:

Notwithstanding OPM's assertion to the contrary, "or" *means* "or": an employee can qualify either by controlling and extinguishing fires *or* by maintaining and using firefighting apparatus and equipment. The House Report does imply that employees must be exposed to some hazard to

---

**18.** Prior to 1994, this quote was contained in 5 C.F.R. § 831.908(a). *See, e.g.,* 5 C.F.R. 831.908(a) (1993).

**19.** From 1990 to 1993, this regulation appeared at 5 C.F.R. § 831.908(e). *See, e.g.,* 5 C.F.R. § 831.908(e) (1993).

qualify even under the maintenance and use clause, but that does not collapse the two clauses into one. *Id.* at 902. Similarly, in interpreting the definition of "law enforcement officer" pursuant to 5 U.S.C. § 8331(20) (2000), "or" means "or." An employee qualifies for Law Enforcement Officer credit if his or her primary duties are the "investigation, apprehension, *or* detention of individuals suspected *or* convicted of offenses against the criminal laws of the United States." 5 U.S.C. § 8331(20) (emphasis added). Upon review of the language of the applicable statute and regulations, the court finds that the plain meaning of the language used is clear. Thus, the court should not look to the legislative history to interpret or modify the standard articulated in the words of the statute for determining eligibility as an Law Enforcement Officer in a primary position, since the meaning of the words is clear in the statute and regulation.

The words and the sentence structure of the statute and regulation defining "law enforcement officer" are uncomplicated and have remained unchanged since 1990. Moreover, Congress set forth a specific definition of "law enforcement officer." In doing so, Congress intended to exclude all other unstated meanings. *See Meese v. Keene,* 481 U.S. at 484–85, 107 S.Ct. 1862.

To be considered "primary duties," the investigative duties of an Law Enforcement Officer must meet three prongs. Primary duties are those that: (1) are paramount in influence or weight; that is, constitute the basic reasons for the existence of the position; (2) occupy a substantial portion of the individual's working time over a typical work cycle; and (3) are assigned on a regular and recurring basis. 5 C.F.R. § 831.902 (2002). The general guideline under the regulation provides that "[i]n general, if an employee spends an average of at least 50 percent of his or her time performing a duty or group of duties, they are his primary duties." *Id.*

Although, as noted in the DEA study of the Diversion Control Program conducted from May 1982 until April 1983 and discussed above, the Diversion Investigator position was originally created to "ensure [ ] compliance with the regulatory aspects of the Controlled Substance Act," the court is concerned, however, not with the reasons why the position was created, but with why this position existed at the time of application for Law Enforcement Officer credit. *See Watson v. Dep't of the Navy,* 262 F.3d at 1300. The DEA study noted the evolution of the Diversion Investigator from a regulatory inspector to a criminal investigator. Moreover, testimony at trial described above demonstrated that Diversion Investigators, such as Mr. Crowley and Mr. Sullivan, spent over fifty percent of their time on criminal investigations following 1974. As testified to at the trial, the percentage of time spent on criminal matters by Diversion Investigators in the Boston regional office was even more pronounced due to the low concentration of pharmaceutical manufacturers, distributors and warehouses within the area covered by the Boston regional office and the correspondingly low number of necessary cyclic investigations.

There is nothing in the record to suggest that the DEA took deliberate action to direct Diversion Investigators away from criminal investigative work. Although the agency, in the Miller and Muller Memoranda, discussed more fully above, announced restrictions on Diversion Investigators regarding certain specific activities, such as undercover work, surveillance, directing or paying informants and execution of search warrants, a Diversion Investigator's primary duties still involved the investigation of individuals suspected of offenses against the criminal laws of the United States. *See* 5 U.S.C. § 8331(20) (2000); 5 C.F.R. § 831.902 (2002). Moreover, no evidence to the contrary was introduced to establish that the DEA altered the criminal investigative nature of a Diversion Investigator's primary duties.

Furthermore, Mr. Crowley testified that from 1974 until 1986, as a Diversion Investigator, he only spent fifteen to twenty percent of his time on cyclic investigations and that the remaining eighty to eighty-five percent of his time was spent on criminal investigations. Two of Mr. Crowley's supervisors, John Cronin and Dennis Johnson, and another Diversion Investigator, Edward Sullivan, confirmed Mr. Crowley's testimony in this

regard. The evidence establishes that Mr. Crowley had frequent, direct contact with criminals and criminal suspects when he interviewed witnesses and developed informants. The plaintiff also participated in searches, conducted surveillance and gathered evidence. The evidence related to Mr. Crowley's actual duties support his assertion that he spent over fifty percent of his time as a Diversion Investigator conducting criminal investigations. Furthermore, the defendant did not attempt to prove and did not offer evidence that Mr. Crowley did not spend more than fifty percent of his time performing criminal investigative duties. Thus, the record supports the plaintiff that from 1974 until 1986, while Mr. Crowley was a Diversion Investigator, he was assigned to and spent over fifty percent of his time working on criminal investigations.[20] In performing this criminal work, Mr. Crowley investigated criminals or suspected criminals for violating the criminal laws of the United States by diverting controlled substances into illegal channels. Because criminal investigations constituted a major portion of Mr. Crowley's assigned Diversion Investigator duties in his position from 1974 to 1986, and because Mr. Crowley spent over fifty percent of his time during those years investigating individuals suspected or convicted of offenses against the United States, based on the plain language of 5 U.S.C. § 8331(20) (2000), the court finds that Mr. Crowley's duties consisted primarily of investigating individuals suspected or convicted of offenses against the criminal laws of the United States. Thus, Mr. Crowley occupied a primary position when he served as a Diversion Investigator from 1974 until 1986.

As discussed above, this court finds that the plain meaning of the applicable statute is clear and that the court should not look beyond the statute to analyze the plaintiff's claims. Moreover, even the MSPB tacitly acknowledged that it was looking to the legislative history instead of applying the plain meaning of the statute. In *Hobbs v. OPM*, 58 M.S.P.R. 628, 632 (1993), the MSPB stat-

ed that "[a] literal reading of 5 U.S.C. § 8331(20) would appear to afford the appellant Law Enforcement Officer retirement credit for his service as a Special Inspector because his duties in that position were 'primarily the investigation ... of individuals suspected ... of offenses against the criminal laws of the United States.'" *Id.* (footnote omitted). The Board stated, however: "We find, however, that such a literal reading [of 5 U.S.C. § 8331(20)] would be contrary to the clearly expressed legislative intent." *Id.* Despite its statement that a literal reading would produce a clear result, suggesting that no resort to legislative history was appropriate, the Board in *Hobbs* stated, "the term 'investigation' under 5 U.S.C. § 8331(20) should be construed as 'criminal investigation,'" regardless of the fact that the word "criminal" does not appear in the statutory definition. *Id.* at 633. Based on its own definition of the term "investigation," constructed, as it stated "in light of the legislative intent," the Board considered factors to determine eligibility for Law Enforcement Officer credit, which, in its view, indicated work in criminal investigations, including "unusual physical hazards for the investigator, deriving from frequent contacts with criminals and suspected criminals," "physical stamina and vigor," and requirements that the investigator "work for long stretches of time without a break, be on call 24 hours a day, and/or carry weapons." *Id.* The Board in *Hobbs*, therefore, relied on other than the normal rules of statutory construction, although the Board stated, "the plain language of a statute should control absent a clearly expressed legislative intent to the contrary." *Id.* at 632 (citing *Miller v. Dep't of Army*, 987 F.2d 1552, 1555 (Fed.Cir.1993)). *But see Weddel v. Sec'y of Dep't of Health and Human Servs.*, 23 F.3d at 391 (noting that plain meaning may be discarded only when the result is "so bizarre that Congress 'could not have intended' it.").

The relevant portion of the legislative history, on which the *Hobbs* court relied, was a statement made in a Senate report:

> Diversion Investigators are conducting diversion criminal investigations (for up to 60 percent of their time) which technically satisf[ies] OPM's definition for eligibility under 6(c)."

---

20. Moreover, a government study of the Diversion Program issued in 1990 also concludes that as late as 1990, "[d]espite the differences between the [1810 and the 1811] series, ..., 1810

The history of retirement legislation dealing with law-enforcement officers and firefighters shows Congressional intent to liberalize retirement provisions so as to make it feasible for these employees to retire at age 50. This intent has been based on the nature of the work involved and the determination that these occupations should be composed, insofar as possible, of young men and women physically capable of meeting the vigorous demands of occupations which are far more taxing physically than most in the Federal Service. They are occupations calling for the strength and stamina of the young rather than the middle aged. Older employees in these occupations should be encouraged to retire.

S.Rep. No. 93–948, *reprinted in* 1974 U.S.C.C.A.N. 3698, 3699. This statement in the Senate report does not contradict the standard set forth in the statute. The legislative history does not establish the criteria for Law Enforcement Officer status, but merely articulates a Congressional goal to develop a more youthful workforce for certain federal occupations. The goal of determining which occupations should be composed of a youthful workforce was considered by the Congress which, nonetheless, ultimately passed a plain English definition of Law Enforcement Officer, which does not include such a statutory goal. Given the clear, unambiguous language of the statute, the legislative history is interesting, but should not be used to alter the plain meaning of the words Congress chose to employ. The statutory language, when applied to Mr. Crowley's case, although not welcomed by the agency, does not produce a result that is so bizarre that Congress could not have intended it.

Subsequent to the issuance of *Hobbs,* the MSPB decided a string of additional cases involving Law Enforcement Officer eligibility, basing their determinations on the factors set forth in *Hobbs. See, e.g., Taylor v. Dep't of Treasury,* 68 M.S.P.R. at 696; *Peek v. OPM,* 63 M.S.P.R. at 432; *Sauser v. OPM,* 59 M.S.P.R. at 492.

Then, in *Bingaman v. Department of the Treasury,* 127 F.3d 1431, the United States Court of Appeals for the Federal Circuit affirmed an MSPB decision regarding Customs Service Detention Systems Specialists or their supervisors, which considered the factors first enunciated in the *Hobbs* decision. Without directly addressing whether or not the statutory and regulatory language of 5 U.S.C. § 8331(20) and 5 C.F.R. 8331,902 are clear on their face, the *Bingaman* court stated that "the statutory term 'law enforcement officer' has not been given expansive application." *Id.* at 1435. The court also stated that "the definition of law enforcement officer in section 8331(20) has been 'strictly construed.'" *Id.* at 1435 (citing *Ryan v. MSPB,* 779 F.2d 669, 672 (Fed.Cir.1985)). Nonetheless, because, according to the court, the statute provided only general guidance, the court went on to expand the statutory definition by approving, as not arbitrary, capricious or not in accordance with the law, the Board's decision to resort to the legislative history to support the MSPB's development of factors to be used to determine Law Enforcement Officer eligibility. *Id.* at 1436. The *Bingaman* court considered six factors laid out in prior M.S.P.B. decisions: (1) frequent, direct contact with criminal suspects; (2) authorization to carry a firearm; (3) interrogation of witnesses and suspects, giving Miranda warnings when appropriate; (4) working for long periods without a break; (5) being on call twenty-four hours a day; and (6) being required to maintain a level of physical fitness. *Id.* (citing *Hobbs v. OPM,* 58 M.S.P.R. 628; *Sauser v. OPM,* 59 M.S.P.R. 489; *Peek v. OPM,* 63 M.S.P.R. 430; *Ferrier v. OPM,* 66 M.S.P.R. 241). The court in *Bingaman* was careful to illustrate, however, that no single factor was "essential or dispositive." *Id.*

In *Hannon v. Department of Justice,* 234 F.3d 674, the Federal Circuit similarly affirmed a decision of the MSPB denying Law Enforcement Officer retirement credit to a Diversion Investigator (who is also a plaintiff in the group of cases consolidated before this court). The *Hannon* court followed the *Bingaman* case and applied the factors enunciated in that case, also without discussing the statutory construction, except to similarly state "we strictly construe the definition of law enforcement officer." *Id.* at 677 (citing

*Bingaman v. Dep't of the Treasury,* 127 F.3d at 1435). The MSPB decision in *Hannon* also was reviewed using the arbitrary or capricious standard. *Id.* at 681–82.

More recently, in *Watson v. Department of the Navy,* 262 F.3d 1292, the United States Court of Appeals for the Federal Circuit elaborated on the language it had used in *Bingaman,* stating that in considering eligibility for Law Enforcement Officer coverage, "[t]he six *Bingaman* factors may ... be considered as necessary and appropriate," but that "[t]his court ... has never adopted the *Bingaman* factors; nor has the court held that federal employees are always entitled to LEO coverage so long as they satisfy the *Bingaman* factors." *Id.* at 1301, 1303. The *Watson* court noted that some of the most probative factors are not even a part of the *Bingaman* test. *Id.* at 1302. Thus, the *Watson* court established five factors, separate from the *Bingaman* factors, which it found to be the "most probative." The *Watson* court stated:

> In order to determine that an officer is entitled to LEO retirement credit, the officer must show that the *primary* duties of his or her position, as defined by 5 C.F.R. §§ 831.902, 842.802 [(1994)], are the investigation, apprehension, and [21] detention of criminals or suspects. The most probative factors, we hold, are: 1) whether the officers are merely guarding life and property or whether the officers are instead more frequently pursuing or detaining criminals; 2) whether there is an early mandatory retirement age; 3) whether there is a youthful maximum entry age; 4) whether the job is physically demanding so as to require a youthful workforce; and 5) whether the officer is exposed to hazard or danger.

*Id.* at 1303 (emphasis in original). Although the *Watson* court reiterated the statutory language and, thus, the standard established by the plain language of 5 U.S.C. § 8331(20) (1994) and 5 C.F.R. § 831.902, the *Watson*

court also relied on legislative intent. *Id.* at 1299. Based on the legislative history, the *Watson* court established a new list of factors it determined to be the "most probative." *Id.* at 1302. The *Watson* court, however, also did not mandate that these factors must be used in examining eligibility for Law Enforcement Officer credit in every case or that an employee must meet all the listed factors for entitlement to Law Enforcement Officer credit.

An even more recent Federal Circuit case is *Hall v. Department of the Treasury,* 264 F.3d 1050. Like the court in *Watson,* the court in *Hall v. Department of the Treasury* warned of over reliance on any particular set of factors. *Id.* at 1056. After reviewing the statute, but without specifically analyzing the plain meaning words of 5 U.S.C. § 8331, and after reviewing the legislative history of the statute, the *Hall* court found that the *Bingaman* factors did not run counter to or replace, but rather reflected, the statutory language. *Id.* at 1056. The *Hall* court characterized the *Bingaman* factors as a "set of tools" which was used by the MSPB to gauge whether the facts of a particular case fall within the definition of the statute. *Id.* The court warned, however, that "the list of considerations set forth in *Bingaman* is by no means an exhaustive or exclusive list of the considerations that bear on whether an employee qualifies for LEO service credit under the statute." *Id.* at 1057. Finally, the court noted that while certain factors could be used by a court in determining Law Enforcement Officer status, 5 U.S.C. § 8331 "serves as the ultimate measure of LEO credit activity." *Id.* at 1056.

As described by the Federal Circuit, the factors used by the MSPB and found reasonable by the Federal Circuit are useful to determine eligibility for Law Enforcement Officer credit. In affirming the decisions of the MSPB, however, by finding that the Board's fact bound decisions were not arbitrary, capricious, or otherwise not in accor-

---

**21.** Although the *Watson* court used the word "and" in describing the standard for Law Enforcement Officer eligibility, 5 U.S.C. § 8331(20) (1994) and 5 C.F.R. § 831.902 (1994), the versions of the statute and regulation the court was interpreting, state that a law enforcement officer

position involves primarily the "[i]nvestigation, apprehension, *or* detention" of criminals or suspected criminals. The 1994 version of the relevant statute and regulation are identical to those currently in force.

dance with the law, the various decisions of the Federal Circuit have been careful to point out that the factors enunciated are not requirements, but only establish a framework which may be utilized.

Because, after careful consideration, this court finds that the plain language of the statute, 5 U.S.C. § 8331(20) (2000), and the regulation, 5 C.F.R. § 831.982 (2001), are clear and unambiguous when establishing the definition of Law Enforcement Officer to be used for determining entitlement to Law Enforcement Officer credit, Mr. Crowley clearly meets the applicable statutory standard. Moreover, because the appellate court has not articulated a precise, binding alternate or fixed standard, this court believes that it should decide plaintiff's case based on the statutory definition. If Congress wishes to change or further define the definition currently offered in the statute, and on which the regulation is based, certainly it can do so. At the present time, however, a fact finding body, such as this one, is left to define a methodology for determining entitlement to Law Enforcement Officer credit. This court believes that the simple words of the statute offer sufficient and clear guidance. However, as discussed below, based on the evidence offered at the trial, even when the factors established in *Watson* and *Bingaman* [22] are reviewed and some combination and selections from those cases is applied to the present case, the court finds that Mr. Crowley occupied a primary position as a Diversion Investigator. Because a lengthy, factfinding trial [23] was held at which relevant facts were elicited, this court includes a discussion of the application of the factors in the event that the appellate court disagrees with this court's statutory construction.[24]

"The evaluation of and weight to be given to the various *Bingaman* [*Watson* and *Hall*] factors and the [evaluation of the] other evidence in the record are judgement calls that rest primarily within the discretion of the [fact finder]." *Hannon v. Dep't of Justice,* 234 F.3d 674, 681 (Fed.Cir.2000). Of course, the exercise of such discretion must be carried out in a way that is not arbitrary, capricious, or not in accordance with the law. Because when the Federal Circuit offered its formulas for determining Law Enforcement Officer credit eligibility, it did not state that each of the factors identified must be considered, did not establish the relative weight to be assigned to any such factor, and did not exclude the consideration of other factors, this court may balance the announced factors to determine which factors are more relevant to the question of whether the plaintiff performed law enforcement work.

Consistent with the statutory and regulatory definition of a "law enforcement officer," the court finds that the factor regarding whether the employee pursued or detained criminals is the most important factor for evaluating eligibility for Law Enforcement Officer credit. Second, the factors related to whether the job is physically demanding, and whether the officer is exposed to danger are also highly relevant to the analysis of eligibility for Law Enforcement Officer credit. In the court's opinion, the second and third *Watson* factors regarding age limits should be given less weight than the other *Watson* factors. Although youthfulness may be relevant to the ability to perform law enforcement duties (the "investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal

---

**22.** The court in *Hall* applied the *Bingaman* factors and did not mention the *Watson* case.

**23.** Similar to the work done in *Buckley v. United States,* 51 Fed.Cl. 174, the court is, again, appreciative of the excellent representation of their clients provided to the court during complex pretrial and trial proceedings by all of the counsel appearing in the *Crowley* case.

**24.** The court notes that presiding officials in another forum have instituted extremely abbreviated proceedings to resolve cases factually similar to the ones before this court. At a recent status

conference, however, counsel for both the plaintiff and the government refused to agree to abbreviated proceedings, even though *Crowley,* and *Buckley v. United States,* 51 Fed.Cl. 174, were selected as test cases in which comprehensive trial proceedings were to be held in order to develop a model to address the large number of remaining cases in this court. Although efforts to produce a reasonable and expeditious method to address the numerous remaining cases filed in this court will remain a priority, the court also is concerned that each plaintiff receive a fair hearing of his or her particular claims.

laws of the United States," 5 U.S.C. § 8331(20) (2000), 5 C.F.R. § 831.902 (2002)), physical fitness is even more relevant and an older employee may be more "physically capable of meeting the vigorous demands of occupations which are far more taxing than most in federal service," than a younger individual. S.Rep. No. 93–948, U.S.Code Cong. & Admin.News 1974, pp. 3698, 3699. Moreover, the absence of age limitations does not necessarily mean that in Law Enforcement Officer job descriptions, a youthful and physically fit work force, although not mandated by Congress, is not desirable. Furthermore, the third *Watson* factor, whether there is a maximum entry age, is not particularly helpful to determine whether an individual is capable of performing law enforcement duties because it appears to be related to the desire to ensure that the employees have a full career prior to collecting any retirement pay. An older individual may be performing law enforcement work for which he or she should receive credit. The statutory test centers on the nature of the actual work performed, not on the age of the employee performing the work. Thus, this court finds that the age limit factors, especially the maximum entry age, are less probative than the other factors identified in *Watson.*

The *Watson* court indicated that although the Circuit Court had never adopted the *Bingaman* factors or concluded that an employee who could satisfy all six *Bingaman* factors automatically would receive Law Enforcement Officer credit, "the six *Bingaman* factors may also be considered as necessary and appropriate." 262 F.3d at 1303. The six factors listed in *Bingaman* are:

> (1) has frequent direct contact with criminal suspects; (2) is authorized to carry a firearm; (3) interrogates witnesses and suspects, giving Miranda warnings when appropriate; (4) works for long periods without a break; (5) is on call 24 hours a day; and (6) is required to maintain a level of physical fitness.

*Bingaman v. Dep't of Treasury,* 127 F.3d at 1436. *Bingaman* factor (1) regarding frequent direct contact with criminal suspects requires a similar evaluation to *Watson* factor (1). *Bingaman* factor (6) regarding physical fitness encompasses primarily the same determination as *Watson* factor (4), which also relates to physical fitness, but without the phrase "so as to require a youthful work force." However, questions regarding the youthfulness of the work force in the *Watson* factors are more explicitly addressed in *Watson* factors (2) and (3), which are related to age limits. The *Watson* court apparently believed that the authority to carry a firearm (*Bingaman* factor (2)), the interrogation of witnesses and suspects, including giving Miranda warnings (*Bingaman* factor (3)), the length of the work periods (*Bingaman* factor (4)) and whether or not the employee is on call twenty-four hours a day (*Bingaman* factor (5)) were relevant, but not dispositive.

Given the direction of the Federal Circuit to use a combination of factors, including those articulated in *Watson* and *Bingaman,* a trial court is left with the task of assessing the eligibility of a particular work series or even of a particular employee, such as Mr. Crowley, on a case by case basis. This is only true, of course, if the precedent suggests that the trial court should ignore the clear words of the statute and regulations, 5 U.S.C. § 8331(20) (2000) and 5 C.F.R. § 831.902 (2002), by resorting to the legislative history and the case precedent based on a review and an interpretation of the legislative history to elaborate on the statutory and regulatory definition.

At trial, there was substantial testimony presented relevant to the factors identified in *Bingaman* and *Watson,* because of the overlap between the factors identified in both cases, regarding the actual duties Mr. Crowley performed while he served as a Diversion Investigator with DEA. The plaintiff admits in his brief that "[i]nitially, in his service with DEA, he was assigned to so-called 'cyclic' reviews of drug manufacturers. These were compliance reviews to assure that the manufacturer was able to account for the drugs produced and that diversion to illicit channels had not occurred." However, Mr. Crowley testified at trial that toward the end of 1974 or early 1975, he began performing criminal investigations, and that he spent at least eighty to eighty-five percent of his time con-

ducting criminal investigations. In October 1979, the DEA instituted an official program called Operation SCRIPT which shifted the focus of the diversion program toward criminal investigations of pre-selected retail violators.

As noted above, in conducting these criminal investigations, Mr. Crowley had direct and frequent contact with criminal suspects, a number of whom were found to be armed. For example, when Mr. Crowley performed a search pursuant to an administrative warrant, as he did while investigating the Bodowin Pharmacy case, the Clukey Pharmacy case and the Manny's Apothecary case, Mr. Crowley interacted with the pharmacists who were suspected of violating the Controlled Substances Act. Moreover, during Mr. Crowley's investigations, he often interviewed witnesses who were either suspected of committing the crime under investigation or had committed other crimes. In the Bodowin Pharmacy case, Mr. Crowley interviewed drug addicts who had illegally purchased drugs from the pharmacy and whom he later found to have long criminal records. In the Wyeth Laboratories case, Mr. Crowley interviewed suspects who he believed may have burglarized the distribution center in question. During the same case, Mr. Crowley interrogated a suspect in the Northampton State Police Barracks. And, in the Clukey Pharmacy case, Mr. Crowley interviewed Mr. Clukey, who was described by local police as the most prominent criminal suspect in the area.

Moreover, the testimony at trial revealed that Mr. Crowley frequently administered Miranda warnings to criminal suspects. In fact, Mr. Crowley was instructed by his supervisors to read Miranda warnings whenever appropriate. When Mr. Crowley and Mr. Hunt served the administrative warrant in the Bodowin Pharmacy case, they advised Mr. Bodowin of his Miranda rights. Prior to interrogating the suspect in the Wyeth Laboratories case, Mr. Crowley read him his Miranda rights. Although Mr. Haislip testified that Diversion Investigators did not routinely Mirandize people because Diversion Investigators did not have the authority to arrest people, he admitted that there may have been occasions when they gave *Miranda* warnings.

Mr. Crowley and the other witnesses also testified that Mr. Crowley worked long hours on criminal investigations, often without a break. During the Bodowin Pharmacy investigation, Mr. Crowley worked "unbelievably" long hours finding and interviewing patients and performing administrative inspection warrants. Mr. Crowley testified that he also worked long hours on the Wyeth Laboratories case. Christopher Egan, a Special Agent in the Diversion Unit of the Boston regional office from 1973 to 1977 testified that Mr. Crowley worked a lot of nights. John Cronin, Mr. Crowley's Group Supervisor from 1978 to 1982, testified that, "quite frequently they [Mr. Crowley's hours] were overtime or he would be working long hours waiting until the pharmacy to [sic] close or a doctor's office closed to interview the suspects without anybody around, or he would be following a suspect, and it would go beyond the normal working hours." Thus, Mr. Crowley's hours were directed by the case he was working on, not by a preset regular work schedule, and he was required to work on cases when the case demanded.

The record also indicates that Mr. Crowley was on call twenty-four hours a day during his time as a Diversion Investigator. Edward Drinan, the Special Agent in Charge for the Portland, Maine DEA field office from 1977 through 1981, testified that he "considered every DEA employee to be at my beck and call, and I made them at my beck and call." James Carr, a member of the Boston police Drug Control Unit during Mr. Crowley's time as a Diversion Investigator worked with Mr. Crowley on the Manny's Apothecary case and testified: "[T]here were times when I would call Mr. Crowley, whether it be on a Saturday or a Sunday or maybe at nighttime or during the day." During the Bodowin Pharmacy case, Mr. Crowley testified that he was on call to his Group Supervisor and to the prosecutor in the case. The Mercy Hospital case, described above, is one example of when Mr. Drinan called Mr. Crowley to respond quickly to a situation. Although Mr. Haislip testified that the DEA did not order Diversion Investigators to be

on call twenty-four hours a day as part of their work, he also stated that, regarding on call duty, he was "[n]ot sure what may have been done at a local level that was not brought to my attention."

The record also indicates that Mr. Crowley's position as a Diversion Investigator was physically demanding. John Cronin, Mr. Crowley's supervisor from 1978 to 1982, testified that to be a Diversion Investigator:

> You had to be out long hours under very stressful conditions. You had to confront individuals or suspects that may have been, may become violent. You had to, quite often, move heavy objects, large cases of drugs. You had to inspect the premises within and without, up in the, often on the roof for security violations or for entrance to, for ... burglaries.

Moreover, Mr. Cronin testified that all of the "investigative personnel," including Diversion Investigators, were allowed to take one hour, three times a week to attach to their lunch hours, to encourage them to workout and maintain physical fitness. This program was encouraged by "DEA management." Mr. Crowley testified that there was a small gym in the office and that the DEA paid for memberships at the YMCA. John Coleman, the Special Agent in Charge of the Boston regional office from 1985 to 1990, who eventually rose to Assistant Administrator for Operations, the third highest career job in the DEA, testified that "[y]ou need people who are physically robust to be able to defend themselves in an emergency, if necessary, because they are, again, dealing with potential adversaries, so you do need an individual who's somewhat robust and able to handle the hazards and difficulties of the job." Mr. Haislip testified that the job of a Diversion Investigator was more physically demanding than "an ordinary job in headquarters." On November 8, 1988, Mr. Haislip wrote a memorandum to Thom-

as C. Kelly, a Deputy Administrator of the DEA, urging that OPM adopt physical standards for Diversion Investigators because "DEA does not have any approved physical standards for entry level Diversion Investigators." [25]

With regard to maximum entry level ages and mandatory retirement limitations, a study of the Diversion Program conducted by DEA, issued on November 21, 1990, and confirmed by Mr. Crowley, found that: "The 1811 Criminal Investigators are also subject to a maximum entry level age limitation (35 years) and to mandatory retirement provisions.... In contrast, the 1810 Diversion Investigators are not subject to any restrictions on entry level age or to mandatory retirement."

Finally, despite the fact that Mr. Crowley's investigations focused on the criminal violations committed by professionals, the record indicates that Mr. Crowley faced a high degree of danger as a Diversion Investigator. In response to a question at trial as to whether dealing with doctors or pharmacists made a Diversion Investigator's job less dangerous, Mr. Coleman, who was in charge of the Boston regional office from 1985–1990, explained:

> It might appear that way except when you begin to think in terms of what these people have at risk. We do have, for example, a good deal of what's called impaired physicians, impaired health care workers.... Drug abuse inside the health care profession is a serious problem, has been recognize[d] as such by the American Medical Association and other major organizations. Consequently, even in dealing with people who might, in the general sense, appear to be as you described, individuals that are impaired are often times dangerous, nonetheless, and as I mentioned, these people have a lot to lose.

**25.** The plaintiff points to information provided on the DEA website, in the fall of 2001, under the title of "Diversion Investigator, A Career Opportunity." Although this website explained that "the duties of Investigators frequently require arduous physical exertion," there is no evidence in the record which demonstrates that the representations made on the web site were approved by OPM or by DEA. *See* www.dea.gov/job/diver- sion/standards.htm (November 26, 2001). The particular web page in question no longer appears on the DEA web site. An excerpt of the 1992 Personnel Manual related to the physical requirements for a Diversion Investigator do not contain the same representations regarding the "arduous physical exertion" required of Diversion Investigators previously found on the DEA website.

When you're dealing with a person who's perhaps a life long criminal, they take their chances, and perhaps when their day is up, they realize they've got to spend some time in prison, or whatever, but that's their life. They've chosen that life. These other folks, they've got a, they've got two lives going. They just don't have their criminal life. They have their professional life, and when that investigator walks through the door, whether it's a pharmacy or a doctor's office or a hospital facility of some sort, or even plant or warehouse, and, and begins to question somebody or review and inspect the documents, there's only one person at that point that really knows what's going on, and it's usually the party that's being investigated, and that person may react in strange ways. We've had situations where these people have reacted in very dangerous and difficult ways.

Mr. Egan testified that he asked Mr. Crowley whether he was armed "because I was concerned because some of the areas that he was in and some of the things he was doing were, had the potential of being dangerous." When asked as to the specific dangers he was concerned about, Mr. Egan stated:

Well, in the parts of his job where he was working with criminal informants, the people, in general, who are criminal informants are criminals, themselves, and they, the places they go and the things they do are criminal in nature, and where there's a lot of money and drugs involved, there's always a potential of danger to the investigator.

Peter Silva, a sergeant with the Boston Police Department, testified: "It was always a wonder to us why they weren't armed." The record shows that many of the pharmacists under investigation were armed. Similarly, Mr. Cronin testified that he considered Mr. Crowley's job to be "extremely dangerous."

Mr. Crowley personally related a number of examples of the dangers he faced. For example, during Mr. Crowley's search for witnesses and "patients" in connection with the Bodowin pharmacy case, Mr. Crowley was constantly in contact with people who were abusing drugs. Indeed, during the Bodowin investigation, Mr. Crowley once announced himself as a DEA agent to a room full of people doing drugs, an act he now admits as "kind of stupid." With regard to the Clukey investigation, Mr. Crowley interviewed and performed surveillance of Mr. Clukey, an armed and notorious criminal. Finally, during the investigation of Manny's Apothecary, Mr. Crowley conducted surveillance in a dangerous area of Boston that was controlled by organized crime and participated in a search.

The defendant argues that "the Miller and Mullen restrictions are highly relevant and indicative of the extent to which DEA minimized the element of danger for Diversion Investigators." The record, however, demonstrates that the Miller and Mullen memorandum were not always followed in the field. Mr. Crowley testified that he did not stand outside while Special Agents secured premises during searches. Moreover, Mr. Crowley testified that, following the Miller and Mullen memorandum, he would conduct surveillance, as long as he was accompanied by a special agent or police officer. Furthermore, the Miller and Mullen memorandum could not shield Diversion Investigators from danger. That the DEA felt it necessary to issue the Miller and Mullen memorandum is indicative of its understanding of the danger posed by the targets of the Diversion Investigators and the persons involved in the illegal diversion of controlled substances. Moreover, the record is replete with testimony, from a variety of sources all noted above, that Diversion Investigators faced danger from the pharmacists they were investigating and the persons who they came into contact with during those investigations.

The evidence presented at the trial demonstrates that as a Diversion Investigator, Mr. Crowley frequently pursued criminals or suspects through his investigations, as opposed to guarding life or property, when he conducted his criminal investigations of the illegal diversion of licit drugs by doctors and pharmacists. In addition, Mr. Crowley's job involved physical demands and required physical fitness. As a Diversion Investigator, Mr. Crowley's position included frequent

walking and climbing when he searched for potential witnesses and informants, as well as hauling evidence. Moreover, Mr. Crowley was exposed to danger when conducting his criminal investigations. Despite the official restrictions placed on Mr. Crowley by the Miller and Mullen Memoranda, Mr. Crowley faced hostile individuals when interviewing drug-seeking individuals, conducting surveillances, pursuing investigations in high-crime areas and participating in searches of locations occupied by hostile individuals who may have been armed. Thus, this court finds that based on the testimony and evidence presented at trial, Mr. Crowley has shown that he meets the first, fourth, and fifth factors set forth in *Watson v. Department of the Navy,* 262 F.3d 1292, all of which are somewhat subjective evaluations. Although the Diversion Investigator position did not have an early mandatory retirement age or a youthful maximum entry age, as discussed above, given the balancing to be made in the court's discretion, based upon the Federal Circuit's opinions in *Watson* and *Bingaman* and given the nature of Mr. Crowley's responsibilities and the work he performed, the identified age limits should be given less weight than the other three factors described in *Watson.*

The available evidence in the record relevant to the consideration of Law Enforcement Officer eligibility under the *Bingaman* factors also supports Mr. Crowley's claim that his primary duties involved the investigation of criminals and suspects. Several witnesses at trial supported Mr. Crowley's testimony that he had frequent direct contact with criminals and suspects during his investigations (*Bingaman* factor (1)). Mr. Crowley frequently interrogated witnesses to obtain information regarding the targets of his investigations, and he gave *Miranda* warnings when appropriate (*Watson* factor (1) and *Bingaman* factors (1) and (3)). The evidence shows that Mr. Crowley worked long hours (*Bingaman* factor (4)), including evenings and weekends to conduct his investigations and that when he conducted surveillances over a period of time, he could not take a break without breaking the surveillance. Mr. Crowley also received calls after normal working hours from his colleagues and associates regarding his investigations, as well as from witnesses and informants. Although Mr. Crowley may not have been directed to be available on call, in order to meet his job description, Mr. Crowley understood that he needed to be available whenever the case required him to be available (*Bingaman* factor (5)). As stated above, Mr. Crowley's job entailed physical demands, although Diversion Investigators were not required to pass any physical fitness tests (*Watson* factor (4) and *Bingaman* factor (6)). Although Mr. Crowley was not authorized to carry a firearm, this factor should not be dispositive for the determination of whether Mr. Crowley performed law enforcement work, and was discounted by the *Watson* court. Upon consideration of the factors set forth in both *Watson* and *Bingaman* and the discussion of those factors in *Hall,* the court finds that Mr. Crowley has satisfied the factors that are most critical for eligibility for Law Enforcement Officer status and that, given the overall scope and depth of his actual duties, he, in fact, performed law enforcement work. Therefore, Mr. Crowley has established that he occupied a primary position as a Diversion Investigator.

## C. Secondary Positions

As stated above, in addition to the transfer requirement, an employee seeking Law Enforcement Officer credit must show, if the employee has occupied multiple secondary positions after the initial transfer from a primary position, that he or she "has been continuously employed in secondary positions since transferring from a primary position without a break in service exceeding 3 days ...." 5 C.F.R. § 831.904(a)(2) (2002). Plaintiff argues that the court should not reconsider whether Mr. Crowley's supervisory positions qualify as secondary positions because "OPM determined that Mr. Crowley's service as a group supervisor met the criteria for credit as a law enforcement officer from June 16, 1986 through September 30, 1991," and that this decision should be considered final. In response, defendant contends that "pursuant to *Bingaman,* as well as the Supreme Court's decision in *Harper [v. Virginia Department of Taxation,* 509

U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993)], concerning the retroactivity of judicial interpretations of law, Mr. Crowley must demonstrate that the employees he supervised during this period were LEOs within the meaning of *Bingaman*."[26] Therefore, defendant argues that OPM's prior approval of Law Enforcement Officer credit using pre-*Bingaman* and pre-*Watson* standards, in the secondary supervisory category is not sufficient for meeting plaintiff's burden to show that he continuously occupied secondary positions after his transfer from a primary position.

As an initial matter, the plaintiff must meet the threshold requirements for receiving credit in a secondary position under 5 C.F.R. § 831.902 (2002), which provides that a secondary position must be: (1) "clearly in the law enforcement or firefighting field;" (2) "an organization having a law enforcement or firefighting mission;" and (3) either supervisory or administrative. As DEA investigators, Diversion Investigators are clearly in the law enforcement field and the DEA is clearly an organization having a law enforcement mission. Defendant does not claim that the plaintiff has not met these requirements. Therefore, the court finds that all of plaintiff's secondary positions are clearly in the law enforcement field and that DEA has a law enforcement mission.

As discussed above, under the regulations in effect from 1981 until 1987, the provision waiving consideration of the transfer requirement after an initial determination that the employee has satisfied the transfer requirement does not satisfy plaintiff's burden to show that his supervisory positions from 1986 to 1991 and again from 1994 to April 1, 2001 are secondary positions. *See, e.g.*, 5 C.F.R. § 931.903(c)-(d) (1987). The provisions in effect from 1981 until 1987 exempted an employee from the obligation to prove that he or she met certain transfer requirements, but the transfer requirements described under the former provisions from 1981 to 1987 are distinct from the transfer requirement imposed after 1987, which the plaintiff is obligated to meet in the present case. In addition, for the same reasons which apply to the discussion regarding occupation of a primary position, the doctrines of judicial estoppel and collateral estoppel do not preclude the reconsideration of whether Mr. Crowley continuously occupied secondary positions after his transfer from a primary position.

## 1. Secondary Group Supervisor Position

■ In 1986, Mr. Crowley transferred from his primary position to the position of Group Supervisor. Mr. Crowley held the position of Group Supervisor during two time periods after his initial transfer from a primary position until the time period for which he seeks secondary administrative credit, the first from 1986 until 1991 and again from 1994 until April 1, 2001. For both of these time periods, Mr. Crowley must prove that the position of Group Supervisor satisfies the definition of a secondary supervisor position meaning, that he served "as a first-level supervisor of law enforcement officers or firefighters in primary positions . . . ." 5 C.F.R. § 831.902 (2002).

As a Group Supervisor, Mr. Crowley was the first-level supervisor for a group composed of DEA Diversion Investigators. To determine whether the Diversion Investigators he supervised were law enforcement officers in primary positions, the definition set forth in the plainly worded statute and the regulations must be applied because the language of the statute is clear. In addition, as undertaken above, the court discusses the application of the *Watson* and *Bingaman* factors to plaintiff's case to determine whether those individuals Mr. Crowley supervised were performing Law Enforcement Officer duties. Thus, the Diversion Investigators Mr. Crowley supervised occupied primary positions if their primary duties were the "investigation, apprehension, or detention" of criminals or suspects. *See* 5 U.S.C. § 8331(20) (2000); 5 C.F.R. § 831.902 (2002).

**26.** In *Harper v. Virginia Department of Taxation*, the United States Supreme Court held:

When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rules. 509 U.S. at 97, 113 S.Ct. 2510.

As discussed above, the basic reasons for the existence of the Diversion Investigator position in which Mr. Crowley served were to conduct criminal investigations of individuals suspected of illegally diverting controlled drugs into the illicit drug market. A number of Diversion Investigators who were supervised by Mr. Crowley testified at the trial. Edward Sullivan, Edward Harrington, Kathi Murphy and JoAnn Masar all testified at the trial and were all Diversion Investigators working under Mr. Crowley from 1986 through 1991. Kathi Murphy and JoAnn Masar also worked under Mr. Crowley during his second tour as a Group Supervisor, from October 1994 through April 1, 2001. Regarding the duties of the Diversion Investigators Mr. Crowley supervised, Mr. Crowley testified that the Diversion Investigators in his group performed criminal investigations about eighty to eighty-five percent of their time. Mr. Sullivan confirmed Mr. Crowley's testimony, stating that he worked eighty-five percent of his time performing criminal investigations, except for four years he spent in Rhode Island working on two organized crime cases, in which he did not perform any cyclic investigations. Mr. Harrington estimated that he spent eighty percent of his time on criminal investigations. With regard to the second period in which Mr. Crowley was a Group Supervisor, Ms. Masar testified that in 2000, she performed only one cyclic investigation that took two days. She spent the rest of her time working on criminal investigations.

By describing the tasks they performed in specific cases, Mr. Sullivan, Mr. Harrington, Ms. Murphy and Ms. Masar all testified that they performed similar tasks as part of the investigations to which they were assigned as did Mr. Crowley. They developed witnesses, gathered evidence, submitted evidence to Grand Juries, developed informants, conducted surveillance, conducted administrative searches and participated in criminal searches of various premises. The evidence in the record demonstrates that the Diversion Investigators supervised by Mr. Crowley spent a majority of time investigating and aiding in the apprehension of criminals or suspected criminals, and that, therefore, they were law enforcement officers in primary

positions. Thus, the court finds that as a group supervisor from 1986 to 1991 and from 1994 to April 1, 2001, Mr. Crowley occupied a secondary supervisory position, within the meaning of 5 C.F.R. § 831.902 (2002).

Although the court finds that the plaintiff's satisfaction of the statutory and regulatory standard is sufficient for proving that his tours as a group supervisor were secondary supervisory positions, the court also considers whether the Diversion Investigators supervised by Mr. Crowley were law enforcement officers in primary positions under the factors discussed in *Hall*, *Watson* and *Bingaman*. The Diversion Investigators working under Mr. Crowley's supervision performed similar duties and had similar responsibilities to Mr. Crowley when he occupied the Diversion Investigator position.

First, the Diversion Investigators supervised by Mr. Crowley worked significantly more than forty hours a week, including weekends. During his investigation of the Dr. Robert Carson case, Mr. Sullivan testified that he worked "late into the night . . . ." Mr. Crowe, a Special Agent who worked with Janet Gardner, a Diversion Investigator working under Mr. Crowley, testified that while they were investigating the Cumberland Prescription Center case, Ms. Gardner and Mr. Crowe performed surveillance "until 8:00, 8:30, maybe nine o'clock upon occasion, and then she would return home. It was my understanding that she would compile and work on her notes when she got home." Mr. Crowe estimated that Ms. Gardner worked ten to twelve hour days on the case. Ms. Masar also testified that the occasion to work long hours without a break: "occurs whenever you have to serve, when, when you're executing a warrant of any type because you can't just stop. It occurs when you're traveling long distances, like we do frequently, because of the area that we cover."

The Diversion Investigators under Mr. Crowley's supervision also had frequent, direct contact with suspected criminals. During the Dr. Robert Carson investigation, Mr. Sullivan interviewed Dr. Carson, Joyce Lori and John Lori, all of who were suspected of illegally selling controlled substances. In ad-

dition, Mr. Sullivan also interviewed a number of persons with associations to motorcycle gangs who were involved with "hard" drugs, such as heroin, cocaine and LSD. In the Cumberland Prescription center investigation, Mr. Harrington testified that he interviewed approximately one hundred people who were suspected of improperly acquiring prescriptions. Ms. Masar testified that while she was investigating the High Street Gang case, she interviewed a number of people who "had prior records of, of drug offenses or they were known to the local departments as being involved in drug activity." Furthermore, the Diversion Investigators in Mr. Crowley's group gave Miranda warnings, which they could read from a card containing the Miranda warnings that was provided to them by DEA, when necessary during interrogations. Ms. Murphy testified that:

> On one occasion, I gave Miranda warnings to an interview—to a, to a person who was incarcerated while I was interviewing him. There were other instances, during criminal search warrants or administrative inspection warrants, where I would give Miranda warnings prior to any information coming out that may, may or shouldn't have at the time.

Moreover, the Diversion Investigators Mr. Crowley supervised were on call twenty-four hours a day. Ms. Masar testified that if she received a call after hours from someone who was working on a case with her she would answer it, and respond, if necessary. More specifically, while Ms. Masar was working on the Operation Ox case, she would respond to any pharmacy burglary that occurred, mostly late at night and on weekends. While Mr. Crowe was working on the Cumberland Prescription case with Ms. Gardner, she was on call to him twenty-four hours a day and he would contact her at home and at night regarding the case.

The Diversion Investigators under Mr. Crowley performed physical tasks. When executing searches, Diversion Investigators were required to carry sometimes heavy boxes and other evidence. Mr. Harrington testified that his Diversion Investigator training, an eight week program in Quantico, Virginia, contained a physical component of calisthenics and running. Although Mr. Harrington was not required to take a physical training test upon graduation, he testified that his training included a physical component, indicating recognition by the DEA that the job which he was being trained for, the Diversion Investigator position, also contained a physical component. The Diversion Investigators who worked under Mr. Crowley also faced physical hardship in terms of the geographic distances and attendant hours included as part of their duties. The Boston regional office covered six New England states: Maine, New Hampshire, Vermont, Rhode Island, Connecticut and Massachusetts. Ms. Masar testified that she was the primary investigator responsible for the entire state of Maine for a period of time. Ms. Masar, who lived in southern Maine, often had to travel 200 miles to northern Maine to investigate cases.

Finally, despite the Miller and Mullen memorandum, the Diversion Investigators supervised by Mr. Crowley performed hazardous duty as also discussed above. For example, Mr. Sullivan, who, through the bulk of his testimony, testified in a straightforward and composed manner, became unsettled when recounting a particular situation:

> We had just finished up a case in Saugus, Mass.... American Discount. I was followed home one night. I lived in New Hampshire. I was followed down 495 for about 25 miles. I was followed up 125. I was getting really scared. I crossed over into New Hampshire, and there was a big car that was following me with four individuals right after I left that particular location in Saugus. And I turned around in a parking lot, and they turned into the parking lot, and I went, they came right for me in the car, and I got the plate number, and I just sped out of there and went home. I immediately called Jack [Crowley], and I had the plate number, and Jack notified George Festa, the SAC [Special Agent in Charge], and my wife was pretty upset. She was crying. She wanted to know why I was pretty upset. I was shook, shook up. I thought someone was going to try to tune me up or do, do me or something. You know, I mean, I

didn't know. You know, you get kind of paranoid, you know, after a while because a lot of times, you're not armed. Okay? And sometimes they think you are, and it's the scariest place to be when you're unarmed, and everyone else is armed, and they put you in these situations. Okay? It's probably the most dangerous job there is when it comes to that because they don't know that you're not armed.

Ms. Masar testified that she considered her job dangerous: "[b]ecause we deal with criminals and drug addicts and people that we are targeting for criminal sanctions or civil sanctions. People that could be spending time in jail that have never gone to jail before." Ms. Masar testified that, for a period of several weeks, she was a target of counter-surveillance. She was followed, several vehicles were parked outside of her house and other vehicles drove by her home and the persons inside the vehicles were looking in her windows. As a result, Ms. Masar had extra police patrols from the local police department because she was afraid for her young daughter.

The evidence shows that, similar to Mr. Crowley's service as a Diversion Investigator, Diversion Investigators supervised by Mr. Crowley more frequently pursued criminals, as opposed to guarding life or property, performed physical tasks that were demanding and were exposed to dangerous situations, despite the restrictions apparently imposed for their safety. Furthermore, the Diversion Investigators in Mr. Crowley's group had frequent direct contact with criminals when interviewing witnesses, developing informants, and aiding in the apprehension of the criminal targets who were illegally diverting controlled drugs. These Diversion Investigators also interrogated witnesses and suspects and gave Miranda warnings when appropriate. Diversion Investigators worked a substantial amount of hours to complete their investigations and were unable to take breaks when conducting long surveillances or extensive searches. These Diversion Investigators made themselves available to their supervisors, witnesses, and informants, as the case required, twenty-four hours a day. Although Diversion Investigators have never been authorized to carry a firearm and have

not been subject to an early mandatory retirement age or a youthful, maximum entry age, these factors are not dispositive for determining whether the Diversion Investigators supervised by Mr. Crowley occupied primary positions. In considering the evidence as a whole, even under the *Watson* and the *Bingaman* factors, the Diversion Investigators in Mr. Crowley's group performed law enforcement work, using the full range of criminal investigative tools to investigate and aid in the apprehension of criminals and suspects involved in illegal drug traffic.

### 2. Secondary Administrative Position—Staff Coordinator

From 1991 until 1994, Mr. Crowley occupied the position of Staff Coordinator in the Office of Diversion at DEA headquarters in Arlington, Virginia. Under the second transfer requirement of continuous employment in secondary positions, Mr. Crowley must prove that his position as Staff Coordinator satisfies the definition of a secondary position under 5 C.F.R. § 831.902 (2002). A secondary position must be either administrative or supervisory. The plaintiff alleges that Mr. Crowley's position as Staff Coordinator qualifies as a secondary administrative position. Under the applicable regulations, a secondary administrative position is "an executive, managerial, technical, semiprofessional, or professional position for which experience in a primary law enforcement or firefighting position, or equivalent experience outside the Federal government, is a prerequisite." 5 C.F.R. § 831.902 (2002). To prove the prerequisite requirement, Mr. Crowley must demonstrate that: (1) as a Diversion Investigator, he had experience in a primary Law Enforcement Officer position; and (2) that such experience was a mandatory prerequisite of his secondary administrative position. Regarding Mr. Crowley's request for administrative credit, defendant argues that "Mr. Crowley has failed to satisfy his burden of proving that LEO experience was a prerequisite for his Domestic Drug Unit position as Staff Coordinator just as he failed to meet his burden for his subsequent position with

the International Drug Unit." [27]

Mr. Crowley was selected for the position as a Staff Coordinator by the DEA Career Board as part of a policy by which field supervisors would rotate into positions at headquarters as Staff Coordinators. Thus, DEA was drawing upon its field supervisors, who had experience in criminal investigations, like Mr. Crowley, to fill the Staff Coordinator positions. The policy indicates that DEA was filing the position with its most experienced personnel, rather than from the outside, and choosing personnel with criminal investigative experience. As Staff Coordinator, Mr. Crowley monitored field offices and coordinated their investigative activities with headquarters and between the offices. Ms. Brophy testified that the Staff Coordinator position could not have been performed if the person did not have criminal investigative experience. As noted above, Ms. Brophy testified that a staff coordinator was required to give advice to "a relatively inexperienced field investigator" and that specific expertise was needed to describe how an undercover buy from a doctor for a controlled substance should take place or what type of evidence is germane to a specific case.

Furthermore, the position description for Staff Coordinator lists several duties requiring extensive knowledge of the activities that Diversion Investigators perform in the field. Specifically, Staff Coordinators are expected to prepare "basic and advanced training material, and technical advice to the field." The position description for a Staff Coordinator states:

> Thorough knowledge of these Headquarters programs as well as field investigative activity involving these areas is required.
>
> . . . .
>
> The incumbent of this position must possess a thorough knowledge of law enforcement as it pertains to the diversion of legitimately produced controlled substances and is required to have an in-depth

knowledge and experience in all aspects of diversion control.

Finally, in a letter in support of Mr. Crowley's application for Law Enforcement Officer credit submitted on September 23, 1993, Mr. Haislip stated:

> A primary selection criteria for [the] position [of Staff Coordinator] is extensive past experience in successfully conducting and supervising criminal investigations. In fact, Mr. Crowley would not have been selected for the position without his extensive experience as a law enforcement officer. The position of Staff Coordinator at Headquarters requires the incumbent to continuously apply the investigative knowledge and techniques learned previously in criminal investigations.

Because Mr. Crowley's position as a Diversion Investigator qualifies as law enforcement officer experience, and because the evidence demonstrates that "in-depth knowledge and experience in all aspects of diversion control" were required to perform the Staff Coordinator position, the court finds that law enforcement experience was a mandatory prerequisite to the position of Staff Coordinator.

Plaintiff claims law enforcement officer credit to the date of his retirement. There was little testimony, however, on the period from April 1, 2001 through the trial during which Mr. Crowley was a "Special Assistant." Furthermore, there is no evidence in the record, nor is the period discussed in plaintiff's briefs. Therefore, the court finds that Mr. Crowley is not entitled to law enforcement credit from April 1, 2001, to his retirement, October 1, 2001.

Based on all the evidence presented and the discussion set forth above, the court finds that Mr. Crowley is entitled to Law Enforcement Officer status during the time period he served in the Staff Coordinator position and the Group Supervisor position and for which

---

27. Although the defendant treats the time Mr. Crowley spent as a Staff Coordinator in the Domestic Drug Unit separate from the time he spent as a Staff Coordinator in the International Drug Unit, his position, Staff Coordinator, and job description, supervising investigations in the field, remained the same throughout that time.

Ms. Fulmore testified that if there was no change in the position description, there was no change in the position. In moving from the Domestic Drug Unit to the International Unit, Mr. Crowley's duties remained the same, the geographic focus was the only element that changed.

he has not been credited from October 1, 1991 until April 1, 2001. Consequently, the plaintiff is entitled to certain benefits flowing from his Law Enforcement Officer status from October 1, 1991 until April 1, 2001.

## D. FLEPRA Section 403

In a motion to dismiss, the defendant earlier argued to this court that only one of the test plaintiffs, John Partridge, held a colorable claim for benefits under FLEPRA section 403, 5 U.S.C. § 5305 note (2000). *Hannon v. United States,* 48 Fed.Cl. 15, 28 (2000). This court found that "[s]ince plaintiff John Partridge is the only party seeking FLEPRA section 403 (5 U.S.C. § 5305 note) compensation, the parties are in agreement on this issue, thus rendering the issue moot," for all plaintiffs before the court other than Mr. Partridge. *Id.* According to plaintiff's brief, however, Mr. Crowley also seeks the special rate of pay afforded to Law Enforcement Officer's pursuant to FLEPRA section 403. FLEPRA section 403, the effective date of which was the first applicable pay period beginning on or after January 1, 1992, does not provide for special rates of pay for Law Enforcement Officers in GS grades at or above GS-10. The defendant states, that "[i]t is undisputed that Mr. Crowley did not serve in a position below GS-10 at any time after the effective date of FLEPRA § 403." The plaintiff has not asserted, in its initial brief or its reply brief, that, following the effective date of FLEPRA section 403, Mr. Crowley occupied a position lower than the grade of GS-10. Nor is such a statement present in the evidence. Thus, plaintiff is not entitled to the benefits pursuant to FLEPRA section 403.

## E. FLEPRA Section 404

The plaintiff argues that he is entitled to an increase in his basic pay based on FLEPRA section 404 5 U.S.C. § 5305 note (2002). FLEPRA section 404(b)(1) states:

> Except as provided in subsection (a), effective on the first day of the first applicable pay period beginning on or after January 1, 1992, each law enforcement officer whose post of duty is in one of the following areas shall receive an adjustment, which shall be a percentage of the officer's rate of basic pay, as follows:

> Boston–Lawrence–Salem, MA–NH Consolidated Metropolitan Statistical Area ...16%

> \*     \*     \*     \*     \*     \*

> Washington–Baltimore DC–MD–VA–WV Consolidated Metropolitan Statistical Area ... 4%

The court has found that Mr. Crowley served in a Law Enforcement Officer position from October 1, 1991 until April 1, 2001. The defendant has not argued, assuming Mr. Crowley met the definition of a Law Enforcement Officer, that he is not qualified to receive locality pay under FLEPRA section 404. Therefore, Mr. Crowley is entitled to locality pay from the effective date of FLEPRA section 404, the first applicable pay period beginning on or after January 1, 1992 until April 1, 2001. From January 1, 1992, until October 30, 1994, Mr. Crowley worked at DEA headquarters in the Washington, D.C. metropolitan area and is, therefore, entitled to a four percent increase in his basic pay during that period. From October 31, 1994 until April 1, 2001, Mr. Crowley served in the Boston, Massachusetts metropolitan area and is entitled to a sixteen percent increase in his basic pay during that period.

## E. Overtime Pay

The plaintiff claims that he is entitled to overtime pay pursuant to 5 U.S.C. § 5542(a)(4) (2000), but does not request overtime pay prior to August 2, 1985 because of the six-year statute of limitations. 5 U.S.C. § 5542(a) provides for premium pay "[f]or full-time, part-time and intermittent tours of duty, hours of work officially ordered or approved in excess of 40 hours in an administrative workweek ... in excess of 8 hours in a day, performed by an employee ...." Law enforcement officers are eligible for this overtime pay and receive an amount equal to the greater of (A) one and one-half times the minimum hourly rate of basic pay for GS-10; or (B) the hourly rate of basic pay of the employee. *See* 5 U.S.C. § 5542(a)(4).

By its terms, the statute establishing overtime pay permits overtime pay only for "hours of work officially ordered or approved." 5 U.S.C. § 5542(a) (2000). The applicable regulations require that no overtime may be ordered or approved except by an officer or employee to whom such authority has been specifically delegated by the head of the department or agency. *See* 5 C.F.R. § 550.111(c) (2002). In determining whether overtime work has been "officially ordered or approved," a written directive or order to perform work beyond the forty hour work week satisfies the statutory standard and is considered "officially ordered or approved." *See Baylor v. United States,* 198 Ct.Cl. 331, 349 (1972) ("Although there is no evidence that any of the plaintiff guard privates were specifically 'ordered' in so many words to report to his assigned post 'a few minutes early,' it is apparent from the April 20, 1960 general directive to 'GSA GUARDS' mentioned hereinbefore that at least on one occasion each guard was instructed in writing that he 'should' do so .... [I]t appears that [the guards] reasonably understood and considered the instruction to be a command that obligated and required them to report to their assigned posts of duty a few minutes before the specified hour of their scheduled shifts."); *Bates v. United States,* 196 Ct.Cl. 362, 367, 371, 450 F.2d 886, 889, 891 (1971) (finding that the regulations and instructions requiring the employees to "report in uniform 15 minutes before the scheduled start of their shifts" constituted an order and approval of overtime work); *Byrnes v. United States,* 163 Ct.Cl. 167, 171, 174, 330 F.2d 986, 988, 990 (1963) (holding that a written directive including a statement that "it is expected that you will perform without extra compensation any overtime that may be necessary to make good cases and achieve effective results in our enforcement work" constituted an explicit expectation that amounted to "inducement and compulsion"); *Farley v. United States,* 131 Ct.Cl. 776, 780, 127 F.Supp. 562, 564 (1955) (holding that an employee working pursuant to a "regulation specifically requir[ing] that the officer remain on duty" is entitled to overtime pay for the time she was on duty in excess of forty hours per week).

In cases in which there is no explicit directive or order requiring work outside the forty hour week, overtime work may be considered "officially ordered or approved" if the employee was induced to perform overtime. *See Adams v. United States,* 162 Ct.Cl. 766, 781 (1963) (finding that the employing agency knew and approved the overtime work and that "[t]he evidence makes it abundantly clear that the [agency], as an entity, induced the overtime, and that the withholding of written authorization or approval was done overtly and as a matter of departmental policy"); *Manning v. United States,* 10 Cl.Ct. 651, 663 (1986) (finding that "plaintiff was clearly induced to put ·in overtime hours" because "[h]e was directly ordered by his Command to increase days and hours of the Special Service facilities at the base, yet at the same time suffered a steady loss of staff to help him keep the facilities open and running."). In *Anderson v. United States,* 136 Ct.Cl. 365 (1956), the Court of Claims considered a case in which the employing agency advised that an administrative work week would be limited to forty hours a week and that overtime would only be approved "under most unusual circumstances." *Id.* at 387. Despite the agency's announcement, the agency encouraged "voluntary overtime" and instructed inspectors to record their actual hours worked on daily reports which were used to rate and recommend the inspectors for promotions. *Id.* at 391–92. The *Anderson* court found that "every administrative device and the tone and content of instructions were so cast as to imply (if not overtly to state)" that the inspectors could not effectively and acceptably perform their work within forty hours per week. *Id.* at 393.

In contrast, in *Albright v. United States,* 161 Ct.Cl. 356 (1963), the Court of Claims found that "a 'tacit expectation' is not equivalent to the statutory requirement of 'official order or approval.'" *Id.* at 361. In *Albright,* although plaintiffs were required by regulation "to report 15 minutes before their tour of duty began, ... actually, they reported at least 20 minutes before." *Id.* at 358. There was no written order requiring the plaintiffs to report five minutes early, but it

was tacitly understood between the plaintiffs and their supervisors that they should be available for duty twenty minutes before their scheduled shift. *Id.* at 361.

▮ The evidence shows that Mr. Crowley worked more than forty hours per week throughout his career with DEA, including evenings and weekends, and did not receive any overtime pay for the hours he worked beyond the forty hour work week until April of 1995. In April of 1995, Mr. Crowley began receiving overtime, but it did not compensate him for the total amount he claims he worked. Mr. Crowley testified that he did not record the amount of overtime he was working because:

> The overtime budget for the rest of the employees was very, very small, and if I, if I wrote down the hours for overtime, I wouldn't be paid anyways. So, it was, it was discouraged. I was told not to do it, and the same would hold true for compensatory time. There was, I was told there was no such thing.

In his reply brief, the plaintiff admits: "To be sure, Mr. Crowley's documentation of his overtime hours could be better." Because he was directed to keep his biweekly sheets consistent with his time and attendance sheets, Mr. Crowley claims that his biweekly sheets do not reflect the actual total hours he worked. Mr. Crowley has offered no written documentation of the overtime hours he worked, instead relying on his testimony that, on average, he worked ten hours of overtime a week. Mr. Crowley did not offer any testimony that he was directed or ordered to work overtime for which he was not compensated. Furthermore, the plaintiff has not presented any evidence that he was ever given an order or directive throughout his career in DEA to work beyond the forty hour work week. There is also no evidence showing that the plaintiff would have received negative feedback if he had not worked overtime. Thus, the evidence shows that overtime work hours were not officially ordered or approved by DEA. The court, therefore, finds that the plaintiff is not entitled to overtime pay pursuant to 5 U.S.C. § 5542 (2000).

## F. Administratively Uncontrollable Overtime (AUO) Pay

▮ As an alternative to overtime pay, Mr. Crowley requests AUO pay, also from August 2, 1985 to October 1, 2001, as restricted by the statute of limitations. AUO is permitted under 5 U.S.C. § 5545(c)(2) (2000), which provides:

> (c) The head of an agency, with the approval of the Office of Personnel Management, may provide that–
>
> . . . .
>
> (2) an employee in a position in which the hours of duty cannot be controlled administratively, and which requires substantial amounts of irregular, unscheduled overtime duty with the employee generally being responsible for recognizing, without supervision, circumstances which require the employee to remain on duty, shall receive premium pay for this duty on an annual basis instead of premium pay provided by other provisions of this subchapter, except for regularly scheduled overtime, night, and Sunday duty, and for holiday duty. Premium pay under this paragraph is an appropriate percentage, not less than 10 percent nor more than 25 percent, of the rate of basic pay for the position, as determined by taking into consideration the frequency and duration of irregular, unscheduled overtime duty required in the position.

The applicable regulations governing the administration of AUO pay clarify the criteria for eligibility for AUO. The regulations at 5 C.F.R. § 550.153(a) (2002) describe the situations in which overtime is administratively uncontrollable:

> [T]he hours of duty cannot be controlled by such administrative devices as hiring additional personnel; rescheduling the hours of duty (which can be done when, for example, a type of work occurs primarily at certain times of the day); or granting compensatory time off duty to offset overtime hours required.

Although the evidence shows that the plaintiff performed duties which required such overtime work, including interviewing witnesses, the plaintiff has presented no evidence which demonstrates that at least some

of this overtime could not have been controlled by rescheduling the hours of duty to incorporate shifts during different times of the day when witnesses could be available. Regarding situations in which Mr. Crowley worked overtime to review records during an audit, or conduct extensive searches, the plaintiff has not shown that some of this overtime work could not have been alleviated by hiring additional personnel. In fact, much of the overtime Mr. Crowley worked may have been due to a shortage of Diversion Investigators. Mr. Coleman testified that he never missed an opportunity to request additional Diversion Investigators because he was understaffed. Furthermore, Mr. Johnson testified that he was put in a position in which he had to assign only one Diversion Investigator to each state within the region and that the situation could have been controlled better if he had more people. Moreover, the plaintiff has not demonstrated that providing compensatory time would not have been effective at offsetting the overtime hours required.

An additional requirement of 5 C.F.R. § 550.153 (2002) for receiving AUO provides that:

[A]n employee is required to perform substantial amounts of irregular or occasional overtime work. In regard to this requirement:

(1) A substantial amount of irregular or occasional overtime work means an average of at least 3 hours a week of that overtime work.

(2) The irregular or occasional overtime work is a continual requirement, generally averaging more than once a week.

(3) There must be a definite basis for anticipating that the irregular or occasional overtime work will continue over an appropriate period with a duration and frequency sufficient to meet the minimum requirements under paragraphs [(1) and (2)] of this section.

5 C.F.R. § 550.153(b)(1)-(3). Mr. Crowley estimated that he worked, on average, ten hours of overtime a week over his tenure at DEA. To the extent that Mr. Crowley performed overtime work, Mr. Crowley has not specified the number of overtime hours which he alleges fit the administratively uncontrollable category. Thus, the plaintiff has not shown that he meets the duration and frequency requirements of 5 C.F.R. § 550.153(b). Because the plaintiff carries the burden to prove that he is entitled to AUO and because the plaintiff has not demonstrated that the overtime he worked was administratively uncontrollable, the court finds that the plaintiff is not entitled to AUO.

### G. Availability Pay

■ As an alternative to either overtime premium pay and AUO, the plaintiff argues that he is entitled to availability pay pursuant to 5 U.S.C. § 5545a (2000), beginning in 1994 when the availability pay statute was enacted, to October 1, 2001. The statute at 5 U.S.C. § 5545a establishes the criteria for eligibility for availability pay as follows:

(b) The purpose of this section is to provide premium pay to criminal investigators to ensure the availability of criminal investigators for unscheduled duty in excess of a 40 hour work week based on the needs of the employing agency.

(c) Each criminal investigator shall be paid availability pay as provided under this section. Availability pay shall be paid to ensure the availability of the investigator for unscheduled duty. The investigator is generally responsible for recognizing, without supervision, circumstances which require the investigator to be on duty or be available for unscheduled duty based on the needs of the agency. Availability pay provided to the criminal investigator for such unscheduled duty shall be paid instead of premium pay provided by other provisions of this subchapter . . . .

5 U.S.C. § 5545a. To qualify for availability pay, the employee must be an Law Enforcement Officer. *See* 5 U.S.C. § 5545a(a)(2). In addition, an employee must meet the requirements of the applicable regulations. The regulation at 5 C.F.R. § 550.103 (2002) establishes the definition of a "criminal investigator" as "a law enforcement officer as defined in 5 U.S.C. § 5541(3) [28] and this sec-

---

**28.** 5 U.S.C. § 5541(3) incorporates the definition of a "law enforcement officer" set forth in 5

tion—(1) Whose position is properly classified under the GS–1811 or GS–1812 series in the General Schedule classification system based on OPM classification standards . . . ."[29] The defendant has asserted, and the plaintiff has not denied, that Mr. Crowley has been classified as either in the GS–1801 or the GS–1810 series, but not in the GS–1811 or the GS–1812 series. Thus, by the plain terms of the regulation, the plaintiff does not qualify for availability pay.

Plaintiff argues that:

Nowhere in the statute does Congress purport to limit availability pay to investigators in the GS–1811 or GS–1810 series. Rather, Congress's explicit definition of a criminal investigator incorporates the definitions of 5 U.S.C. §§ 8331(20) and 8401(17)[30] and limits it to those law enforcement officers involved in criminal investigations rather than apprehension or detention.

Although the availability pay statute does incorporate the definition of an Law Enforcement Officer that is set forth in 5 U.S.C. § 8331(20) (2000), the statute does not state that Law Enforcement Officer status is the only requirement necessary for entitlement to availability pay. Additional requirements for entitlement to availability pay were promulgated in the applicable regulations, and these regulations specifically do not support plaintiff's interpretation of the criteria for availability pay. The definition of a "criminal investigator" set forth in 5 C.F.R. § 550.103 (2002) establishes a discreet list of positions which meet the "criminal investigator" requirement, which also must be met in addition to the requirements under 5 U.S.C. § 5545a.

Plaintiff next argues that "he meets the definition of a criminal investigator under 5 U.S.C. § 5545a(a)(2) [(2000)] and, thus, that his position properly should be classified as a GS–1811." Although the court has found

that the plaintiff has performed Law Enforcement Officer work, the regulation does not permit the disbursement of availability pay to employees who have not been classified as a GS–1811. The regulation expressly requires that for availability pay, the employee must be classified as a GS–1811 and that this classification must have been properly determined. Because the plaintiff does not meet the regulatory definition of a "criminal investigator" for the purposes of entitlement to availability pay, the court finds that the plaintiff is not entitled to availability pay.

## CONCLUSION

For the reasons set forth above, the court finds that Mr. Crowley qualifies for Law Enforcement Officer credit from October 1, 1991 to April 1, 2001. As an Law Enforcement Officer, Mr. Crowley is entitled to benefits flowing from FLEPRA section 404 at a rate of four percent from the first applicable pay period following January 1, 1992 to October 30, 1994 and at a rate of sixteen percent from October 31, 1994 to April 1, 2001. Mr. Crowley, however, has not met his burden of proving that he is entitled to overtime pay under 5 U.S.C. § 5542 (2000), AUO pursuant to 5 U.S.C. § 5545(c)(2), or availability pay under 5 U.S.C. § 5545a.

**IT IS SO ORDERED.**

---

U.S.C. § 8331(20) and analyzed in the discussion above.

**29.** The definition of a "criminal investigator" under 5 C.F.R. § 550.103 lists several other positions that qualify as a "criminal investigator" position. The plaintiff does not claim that he occupies one of those other positions.

**30.** The definition of an Law Enforcement Officer established under 5 U.S.C. § 8401(17) (2000) applies to employees seeking benefits under the Federal Employees' Retirement System, which does not apply in the present case because Mr. Crowley's benefits would arise under the Civil Service Retirement System.